In the Matter of the Rehabilitation of
**NATIONAL HERITAGE LIFE
INSURANCE COMPANY.**

Civ. A. No. 13530.

Court of Chancery of Delaware,
New Castle County.

Date Submitted: Sept. 21, 1994.
Date Decided: Oct. 17, 1994.

OPINION

ALLEN, Chancellor.

Pending is an application by the Insurance Commissioner of the State of Delaware for an order requiring TPM Holdings, Inc. ("TPM"), a non-resident of the State of Delaware, to turn over to the Commissioner certain documents, books and records claimed to be the property of National Heritage Life Insurance Company, a Delaware domestic insurance company in rehabilitation. TPM, by its counsel, has appeared to contest this court's jurisdiction over it and asserts that in the absence of *in personam* jurisdiction over TPM the court may not enter an order requiring it to perform any act.[1]

The procedural background of the motion may be stated briefly. On May 25, 1994 the Commissioner filed a Petition for Rehabilitation and Injunction Order under Section 5911(a) of our Insurance Code. Factually, that petition alleged that National Heritage's March 1, 1994 financial statements disclosed that it had assets of $453,346,660, liabilities of $417,365,946 and a policy holder surplus of $35,980,714. It was alleged, as well, that a recent financial examination disclosed that assets valued at approximately $250 million had been bought and sold between September 30, and December 30, 1993, but that, as of the date of the petition, "neither National Heritage nor the Delaware Insurance Department [had] been able to ascertain the location or value of the assets acquired in exchange for the $250 million paid by National Heritage."

It was further alleged that "[a]t this time there is no evidence that National Heritage is financially impaired as a result of these transactions"; nevertheless it was alleged that "the State of Florida has publicly suspended National Heritage from writing business in Florida" and that "[t]he Delaware Insurance Department and the present management of National Heritage share a concern that the action of the Florida Insurance

Glenn C. Kenton, Stephen E. Herrmann, and Deborah E. Spivack of Richards, Layton & Finger, Wilmington, for Ins. Com'r of the State of Del., as Receiver for National Heritage Life Ins. Co. in Rehabilitation; Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, of counsel.

Phebe S. Young and John J. Schreppler, II of Bayard, Handelman & Murdoch, P.A., Wilmington, for TPM Financial, Inc.

1. TPM has not been named as a defendant in any action in this jurisdiction nor has it been served with process under any statute. Nevertheless it has appeared by counsel to contest the propriety of the order sought.

Department will," in the language of the Petition, cause a "run on the bank."

As a result it was alleged that the board of directors of National Heritage had consented to the Delaware Insurance Department's request to have a rehabilitator appointed for the company.

On the representation that the situation was regarded as an emergency, a hearing on this application was held the following day, without notification to any third party, and an order in the form submitted by the Insurance Commissioner and consented to by National Heritage Life Insurance Company was entered at that time (the May 25 Order). That order provided in pertinent part that:

> Pursuant to Title 18 *Del. C.* § 5910(a), the Commissioner shall forthwith conduct the business of National Heritage pursuant to the terms of this Order and *take exclusive possession and control of and be vested with all right, title and interest in, of or to the property of National Heritage* including, without limitation, all of National Heritage's assets, contracts, rights of action, books, records, bank accounts, certificates of deposits, collateral securing obligations to or for the benefit of National Heritage or any trust deed, bailee or agent acting for or on behalf of National Heritage, securities or other funds, and all *real or personal property of any nature* of National Heritage ... (emphasis added)

On June 27, 1994 this court entered a supplemental rehabilitation order providing, in part, that the Commissioner had the power to reject any executory contract to which National Heritage was a party and that any party to a rejected contract may file a claim for damages "only arising from such rejection" in the rehabilitation proceeding. *See DuPont v. Standard Arms Co.*, Del.Ch., 81 A. 1089 (1912); *Conover v. Sterling Stores Co.*, 14 Del.Ch. 26, 120 A. 740, 741 (1923).

\* \* \*

Among the contractual relations of National Heritage was a contractual relationship with TPM, Inc., a Nevada corporation. National Heritage has entered into a number of contracts with TPM pursuant to which National Heritage paid substantial sums of money to TPM in exchange for certain rights that TPM had in various mortgage notes. Most significantly these agreements include a Master Loan Sale Agreement of December 28, 1993 with Addenda of December 30, 1993 and December 31, 1993 and a Servicing Agreement as of December 31, 1993. In these agreements, *inter alia*, TPM reserved the right to service the mortgages for a stated fee, kept control over all books and records relating to the mortgages in that connection and reserved other rights including certain rights to buy back mortgages notes under certain circumstances.[2]

2. Pursuant to the Master Sale Agreement TPM agreed to sell and National Heritage agreed to purchase certain mortgage loans, and related servicing rights, at a purchase price of 100% of the loans' aggregate outstanding principal balance. The Master Loan Sale Agreement also provides that TPM would service the loans at the request of National Heritage for a fee of one-twelfth of one percent of the outstanding principal balance of the loans per month. The Master Loan Sale Agreement contained customary representations and warranties on the part of TPM. The representations and warranties of TPM under the Master Loan Sale Agreement were to survive for a period of eighteen months after closing, which was stated to be held on or before December 31, 1993.

The provisions of the First Addendum to the Master Loan Sale Agreement, dated December 30, 1993, were substantially deleted by the Second Addendum, dated December 31, 1993. For example, the Second Addendum revokes National Heritage's right of first refusal on future TPM sales of mortgage loans and TPM's guarantee of a 9.5% minimum annual rate of return to National Heritage. The Second Addendum also provides that:

● the purchase price for the assets would be approximately $54.6 million, an increase of approximately $5 million;

● TPM's representations and warranties would be largely eliminated, including, among others, a representation that the loan information given to National Heritage by TPM was materially true and correct;

● TPM would be granted a potential profit participation of 50% if National Heritage securitized the purchased assets and would have the right to cause National Heritage to pay $10 million to redeem such profit participation right; National Heritage would be granted the right *to compel TPM to redeem its profit* participation for the same amount;

● if securitization did not occur by August 31, 1994, TPM would be granted the right through August 31, 1995 to repurchase any loan at a price equal to National Heritage's purchase price, together with interest at the annual rate

On August 3, 1994 the Commissioner filed a Motion for Temporary Restraining Order and "for turnover of assets of National Heritage Life Insurance Company" pursuant to the earlier May 25 Order. Pursuant to this motion, the Commissioner seeks an order *compelling TPM to turn over all assets—* principally mortgages and real estate valued in the approximate total amount of $88 million—*and documentation in its possession related to the servicing of loans owned by National Heritage.* "Documentation" includes all collateral documents and loan files in any way related to the mortgages being serviced or real estate owned (including all original documents); all blank check stock and any work in progress in the cashiering area; all escrow deposits; all cash obtained in collection of principal and interest; and a copy of all computer records maintained on these loan portfolios. These items are sought so that National Heritage may install a servicer to replace TPM.

At a hearing on the appropriateness of entering an order of this type TPM Financial, Inc. appeared by counsel to assert its right under the United States Constitution as well as Delaware law (10 *Del. C.* § 3104) not to be subject to the jurisdiction of this court. According to TPM it has legal rights in the property claimed by the Commissioner on behalf of National Heritage and its rights may not be adjudicated or adversely affected by court order in its absence. TPM asserts that it cannot coercively be subject to *in personam* jurisdiction in the State of Delaware. It further asserts that the assets which it holds are not subject to the *in rem* jurisdiction of this court, and that, therefore, this court does not have any jurisdictional basis necessary to issue the order which the Commissioner requests.

## I. Necessary Determination of the Nature and Extent of Property Interests Under the May 25 Order and Section 5911

■ For the reasons that follow I conclude that this court's order of May 25th was effective to transfer to the Commissioner, as court appointed rehabilitator, all of the rights, titles and legal interests of whatever type belonging to National Heritage. That order is, I believe, entitled to the full faith and credit of sister jurisdictions insofar as it affects that transfer. But that order did not itself affect the scope or nature of the property rights of National Heritage. More particularly it did not create a right of possession to any property to which National Heritage did not have a present right of possession.

Petitioner claims otherwise. She asserts that the language of the May 25 Order created an obligation on the part of all persons everywhere to turn over to the Commissioner all "property" in which National Heritage has (or claims, I suppose) a property interest. Since TPM is an entity that has possession of various documents, books, records and other papers used with respect to the perfection and servicing of mortgage notes that are claimed to be "owned" by National Heritage, the Commissioner asserts that TPM is now under an obligation to turn over possession of those items to her.

of 9.5%, plus the amount of advances with respect to the loan made by National Heritage to TPM under the Servicing Agreement (see below), less amounts paid under the loan after closing by its obligor.

The Second Addendum further provides that the servicing arrangements between TPM and National Heritage would be governed by a Loan Servicing Agreement between National Heritage and TPM, as servicer (the "Servicing Agreement"). As stated above, under the Servicing Agreement, TPM services the loans and other assets acquired by National Heritage from TPM for a fee of one-twelfth of one percent per month of the outstanding principal balance of the loans and other assets plus reasonable out-of-pocket expenses. Among other things, TPM is required to remit and report to National Heritage all sums received on principal or interest, at such intervals and in such manner as National Heritage may specify, retaining any amounts to which TPM is entitled under the Servicing Agreement. The Servicing Agreement is terminable by TPM on ninety days notice to National Heritage, but National Heritage may not terminate the Servicing Agreement unless the securitization under the Second Addendum has occurred and TPM has received all amounts owing to it in respect of the securitization.

Insofar as the TPM agreements provide for future performance by the parties (other than the mere payment of money for obligations previously incurred), National Heritage contends that they are executory contracts of National Heritage cancellable under the order entered on June 2, 1994. See Sillman, Aff. ¶ 7–14.

■ The statutory language upon which the May 25 Order was based provides that "... the Commissioner [shall be directed by the court] forthwith to take possession *of the property of the insurer....*" 18 *Del. C.* § 5911(a) (1989) (emphasis added). But the term "property" in that statute is not an unproblematic term. What constitutes a person's "property" in a thing is a legal conclusion that of course may be subject to legitimate dispute. Various legal rights can and do coexist with respect to a single piece of land, material object or intangible asset. When that is the case—for example when there is a life estate and a remainder interest, or when there is a tenant and fee simple owner of real estate—there is not a single owner of the "property," rather there are owners of different though compatible property rights. The phrase "take *possession* of the property of the insurer" can only mean to take possession of any and all material things or documents of title *to which the insurer had the right of possession* among its legal interests. The statute cannot mean more. The court may not create new legal rights (i.e., the right to possession if it did not exist) through its *ex parte* order.[3]

More fundamentally, while Section 5911 requires that the Court direct the Commissioner to take possession of "property," it is not self-executing nor does it purport to have an extra territorial effect; that is, it does not purport to require persons in other states (or indeed even persons in Delaware) to turn over to the Commissioner such property. It simply requires the Commissioner to take appropriate steps to take possession: make demand or institute litigation. If the holder of the property is subject to suit in Delaware, the litigation may be initiated here; if the holder is not subject to suit in this jurisdiction, then Section 5911(a) may require suit elsewhere.

In any such suit, a core issue would be whether National Heritage's "property" included a possessory right. This may be a complicated question requiring a level of inquiry that in this instance the Commissioner has not undertaken; but in all events a jurisdictional basis is required to take it up. We, thus, come to question whether such an adjudication can constitutionally be had in this jurisdiction. TPM claims that this court lacks jurisdiction over it and that such jurisdiction is essential to entering a valid order requiring it to deliver to another property that it holds.

The Commissioner contends that this court has both *in rem* and *in personam* jurisdiction permitting such an order.

## II. *In Personam* Jurisdiction

■ While the Commissioner asserts that this court need not possess *in personam* jurisdiction over TPM in order to require TPM to turnover the books and records in TPM's possession, she nevertheless asserts that the court does have such jurisdiction. I cannot agree that this court does have *in personam* jurisdiction over TPM.

It is well-settled that a non-resident must have at least minimum contacts with the forum state for that state to assert *in personam* jurisdiction over her. *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579–80, 53 L.Ed.2d 683 (1977); *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The non-resident's "conduct and connection with the forum State ... [must be of such character] that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). A non-resident's entering into a contract with a domicile of the forum State has been held insufficient, in and of itself, to permit the exercise of personal jurisdiction over her.

---

**3.** *Consider for example either of the two examples mentioned above, the holder of a life estate where an insurance company has purchased the remainder or a lessee of an insurance company. In both instances I would think it evident that entry of an ex parte order under Section 5911(a) would not entitled the Commissioner to take possession of the land (i.e., to oust the holder of a life estate or dispossess a tenant on the land* under a lease for a term) but could only authorize him to take possession of the rights (the property) of the insurer such as they exist at that time. This example can be generalized. In any instance when there are multiple "properties," the Commissioner succeeds, pursuant to a Section 5911(a) order, only to that right and interest as the insurer itself had.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479–80, 105 S.Ct. 2174, 2185–86, 85 L.Ed.2d 528 (1985).

The facts as they appear for purposes of the motion show that other than entering into a complex commercial contract with a corporation formed under Delaware law and regulated under that law, TPM has had no contact with this state. The contracts between National Heritage and TPM were apparently negotiated in Florida or Nevada and performed entirely outside of this state. The Commissioner, though, contends that National Heritage's Delaware incorporation and regulation are sufficient "connections" to subject TPM to *in personam* jurisdiction here with respect to any claim arising out of those contracts.

To support this argument, the Commissioner relies on *Matter of Mutual Benefit Life Ins. Co.*, 258 N.J.Super. 356, 609 A.2d 768 (1992), a case involving a domestic insurance company reorganization. That decision held that the lower court possessed the personal jurisdiction required to enjoin three out-of-state banks from foreclosing on the insurer's property. The basis for the injunction was the lower court's earlier order authorizing the New Jersey Commissioner of Insurance to:

(1) take possession of Mutual Benefit Life's ("MBL") real and personal property 'of any nature'; (2) conduct its business; and (3) remove the causes and conditions which had made rehabilitation necessary

and restraining all other parties from:

(1) bringing or maintaining any action against MBL [except in the reorganization court]; (2) making or executing any levy upon MBL's property; (3) selling, transferring, wasting or otherwise disbursing or disposing of or encumbering the assets and property of any nature of MBL. . . .

*Id.* 609 A.2d at 770. In the rehabilitation proceeding an additional provision specifically enjoined all persons claiming a secured, priority or preferred interest in any of MBL's property or assets from engaging in any step to "transfer, sell, encumber, attach, dispose or exercise 'purported' rights in or against any property or assets of MBL." *Id.*

At the time of the action, MBL indirectly owned interests in forty-four real estate projects located in 15 different states. MBL had obtained these interests through its ownership of limited partnerships which had served as the developers of the projects. MBL (or its wholly owned subsidiary) owned 50% or 100% of each of these limited partnerships. In order to finance the real estate development, these limited partnerships had obtained loans from state or local agencies, such as county housing authorities in the area where the respective development was to take place. These agencies had lent funds to the limited partnership and in return received security agreements, an assignment of rents, and a mortgage on the project or a deed of trust. In addition, MBL itself had guaranteed these loans. The state or local agency lending the funds to the limited partnership would in turn finance the loan by issuing bonds. Under the respective indenture agreements relating to these public bonds, the agency would assign its rights and interests to the bond trustee. The three banks that were enjoined served as bond trustees to whom the right to collect under the guaranty was assigned.[4]

MBL's guaranty on the bonds provided that the bond trustee was to proceed against the guarantor before exercising any other remedy. The Court's rehabilitation order either constituted a default or triggered payment obligations under each of the three bond guaranties. When MBL did not satisfy the guaranty, the respective banks either brought foreclosure actions or sought to preserve their right to later do so.[5] The New

---

4. Each bank served as a bond trustee for a separate bond issue. A Tennessee bank served as trustee for a bond issued by a Tennessee county's housing board; a South Carolina bank served as trustee for two bond series issued by the South Carolina Housing Authority; and finally, a Maryland bank served as trustee for a bond issued by the housing authority of that state.

5. The Tennessee bank filed a complaint and obtained appointment of a receiver in the Chancery Court of the Tennessee county which had issued the bonds and where the project was located. Prior to the injunctive action, the other two banks had not yet brought foreclosure proceedings, though one indicated its intention to do so

Jersey Insurance Commissioner sought an injunction in the State of New Jersey to prevent any foreclosure. The banks contended that the Trial Court lacked *in personam* jurisdiction over them.[6]

On a very thin showing, the Appeals Court held that the banks had sufficient minimum contacts with the State of New Jersey to be constitutionally subjected to New Jersey jurisdiction. The Court recognized that the United States Supreme Court had held in *Burger King* that the entry into a contract by a non-resident with a domiciliary is alone not a sufficient contact to support *in personam* jurisdiction, but rather is merely a factor to be "examined in the context of the overall business transactions related to and surrounding the contract and the parties' relationship." *Mutual Benefit Life,* 609 A.2d at 776. In making such an examination, the New Jersey Court found that the contract had a number of provisions alerting the non-resident of the contract's connection with the State of New Jersey. The combination of these provisions, the Court found, furnished the banks with sufficient notice that they should have reasonably anticipated being haled into a New Jersey court. The Court explicitly based its decision on the fact that the guaranties, which were "integral to marketing of the bonds," "specifically acknowledge[d that] MBL [was] regulated in New Jersey, that its activities require[d] compliance with New Jersey law, and *critically,* that New Jersey substantive law [was] to apply." *Id.* at 776–77 (emphasis added). The Court further concluded that the fact that the rehabilitation order constituted a default of the bonds, permitting the guaranty to be exercised, indicated that the parties regarded the New Jersey regulatory authority as "an essential element of MBL's viability in the transaction." *Id.* at 777. Assuming that the factual conclusion reached in *Mutual Benefit Life* was sustainable, nevertheless that opinion provides no persuasive authority for the result that the Commissioner seeks in this case.

The content of the contract between TPM and National Heritage differs in a significant, in fact dispositive, way from the contract between the banks and MBL. The TPM/National Heritage contract makes only one reference to the State of Delaware; it recites that National Heritage is incorporated in Delaware. The fact that National Heritage is regulated by Delaware is not stated in the contract. Nor is the contract governed by the laws of the forum state as was the case in *Mutual Benefit Life,* a fact which that Court regarded as "critical." The National Heritage/TPM contracts are explicitly governed by the law of the State of Florida.

TPM's only connection with Delaware, therefore, is that it contracted with an insurance company legally domiciled in the State of Delaware. In order to find on these facts that TPM had the necessary minimum contacts with Delaware to be subject to *in personam* jurisdiction, I would be required to hold that any contract with a Delaware domestic insurance company subjects the out-of-state contracting party to *in personam* jurisdiction in this state with respect to any suit arising from such contract.[7]

The only rationale that could support such a conclusion would be a circular one: one who contracts with an insurer should understand that the regulator of that insurer may, upon being appointed receiver or rehabilitator of the insurer, sue them in the state of the insurer's incorporation. Therefore, since

and the other wished to preserve its right to do so. *Mutual Benefit Life,* 609 A.2d at 773–74.

6. The banks also asserted that there was no statutory basis for the restraints because the properties were not MBL assets, but rather belonged to the limited partnerships. This issue is not relevant to this Court's determination because the New Jersey Court was able to determine the question of whose property the real estate was only because the Court had *in personam* jurisdiction over the banks.

7. With respect to corporations formed under Title 8 of the Delaware General Corporation Law, in *Newspan, Inc. v. Hearthstone Funding Corp.,* Del.Ch., C.A. No. 1104, Allen, C., slip op. at 17, 1994 WL 198721, *6 (May 10, 1994), I stated the opinion that a "contract between a Delaware corporation and a nonresident to provide goods or services outside Delaware, or to transact business outside Delaware, which has been negotiated without any contacts with this state, cannot alone serve as a basis for personal jurisdiction over the nonresident arising out of that contract."

such a person should reasonably apprehend that fact, minimum contacts under the *International Shoe, Burger King* line of cases will be found to be present.[8]

Insurance companies are not the only regulated entities in our legal order. Banks, public utilities of all sorts, brokers, licensed professionals and indeed many forms of licensed businesses are subject to various degrees of state supervision and regulation. A rule that those who contract with such entities, by reason of the entities' regulated status, will be susceptible to *in personam* jurisdiction in a state with which they otherwise do not have sufficient contacts to satisfy the Fourteenth Amendment would constitute an exception to the jurisprudence of the *International Shoe* case and its progeny that has no precedent.

I conclude that this court lacks *in personam* jurisdiction over TPM and thus cannot effectively order TPM to perform any act.

### III. *In Rem* Jurisdiction

■ Finally, the Commissioner argues that an absence of personal jurisdiction over TPM is not fatal to her application for a "turnover order." The Commissioner asserts that a rehabilitation proceeding under the UILA is an *in rem* proceeding; that therefore the court has constructive possession of all of the insurer's property wherever located; and that the purpose of the UILA would be entirely frustrated if this court could not order the turnover of the insurer's assets, wherever located. While I concur that a rehabilitation is an *in rem* proceeding, I cannot agree that that fact gives this court jurisdiction to enter an order that conclusively or authoritatively adjudicates the right of possession to the property held by TPM and claimed by National Heritage.

Petitioner cites *Ballesteros v. N.J. Prop. Liab. Ins. Guar. Ass'n.*, 530 F.Supp. 1367

(D.N.J.), *aff'd*, 696 F.2d 980 (3d Cir.1982) which held that a rehabilitation proceeding under the UILA is an *in rem* proceeding. *See also Blackhawk Heating & Plumbing Co., Inc. v. Geeslin*, 7th Cir., 530 F.2d 154, 158 (1976).

*Ballesteros* was an action brought in New Jersey on an insurance policy by a party with an unsatisfied judgment against the policyholder. Prior to the filing of the New Jersey suit, however, a court in New York had appointed a receiver for the New York insurer under the law of the state of incorporation and had ordered the termination of all insurance contracts. The policyholder in *Ballesteros* had not had actual notice of this New York action and was not suggested to have been subject to *in personam* jurisdiction in New York. Nevertheless, noting that a rehabilitation proceeding is an *in rem* proceeding, "in which the state court generally has exclusive control over the assets of the impaired insurance company," the district court dismissed the case. *Ballesteros*, 530 F.Supp. at 1371.

From this precedent the Commissioner argues that this court's May 25 Order brought all of National Heritage's property into this court for adjudication of claims relevant to that property and that this court has the judicial power to affect title or possession or any other legal attribute of that property because the property is *here.* The Commissioner claims that since the property she seeks—records, documents and papers held by TPM in Nevada—constitutes material that is property of National Heritage, it follows, from the nature of this *in rem* proceeding that it is here too. That this argument is an utter fiction is not fatal to it but cannot be counted as one of its stronger points.

■ The petitioner has misunderstood, I believe, the nature of an *in rem* action of this sort. When it is said that in such an action

---

8. One must ask why a person who engages in the single act (or repeated acts) of simply contracting elsewhere for a performance elsewhere should reasonably apprehend the prospect of being haled into a Delaware court. I suppose that, absent a consent, only if the pertinent statutory or common law itself so provided could one conclude that such an expectation did or should have existed. But *Mutual Benefit* is the only case

that the Commissioner offers and it does not involve the stark principle I now consider. More importantly, plainly the *Uniform Insurers Liquidation Act* ("UILA") does not contemplate that every party who contracts with a domestic insurer is thereby subjected to *in personam* jurisdiction in the courts of the domiciliary state. *See infra* Part III.

the property of the corporation is brought into the court, it means that all of the right, title or interest of the corporation *are now held subject to court control* and that the *powers of the corporation are exercised subject to court control.* The res that is taken into court is the corporation itself, the fictive entity. But while the corporation is thus taken into court in this sense, it takes things too far to suppose that beyond the corporate entity, all of the corporation's property (right, title and interests including claims) is brought into the court *for the purposes of adjudicating adverse claims.*

■ The domiciliary (New York) court referred to in *Ballesteros* was exercising *in rem* power over the insured, not its property. It operated upon an obligation of the domestic corporation in receivership. It is elementary that on a proper showing a court of competent jurisdiction may appoint a receiver to judicially dissolve a domestic corporation. See 8 *Del. C.* § 279. When a corporation is in dissolution all of its *obligations* are proper claims in the dissolution proceeding.[9] A dissolution proceeding is an *in rem* action; those who have claims against the corporation can have those claimed corporate obligations affected in the domestic rehabilitation or dissolution, upon notice and opportunity to be heard, whether or not they are subject to *in personam* jurisdiction in the state where the dissolution or rehabilitation is taking place. This is simply a consequence of the fact that upon dissolution the corporation will cease to exist as a legal entity. *But see* 8 *Del. C.* § 279 (court may appoint trustee for dissolved corporation).

■ But these principles do not extend to claims of the corporation *against* non-residents. A court supervising a dissolution cannot, simply by reason of the *in rem* nature of the action, adjudicate corporate claims against non-resident third parties. Rather in that case the court which gives affirmative relief against another (for example, a "turnover order") must have jurisdiction over the person against whom the corporation's claim is asserted. *See Riley v. New York Trust*

*Co.,* 315 U.S. 343, 62 S.Ct. 608, 86 L.Ed. 885 (1942) (holding that the full faith and credit clause did not bind a Delaware court to accept a Georgia court's finding in an *in rem* proceeding where the Delaware court was disposing of local assets); *American Druggists' Insurance Co. v. Carlson,* W.D. Mich., C.A. No. G85–340, 1989 WL 513218, 1989 U.S. Dist. LEXIS 17719 (1989) (failing to give an Ohio court's order for the turnover of files located in Michigan full faith and credit because the Ohio proceeding was an *in rem* proceeding which could only bind property located within Ohio).

\* \* \*

■ Finally, the Commissioner argues that Delaware adoption of the UILA, 18 Del. C. § 5901, *et seq.*, will be rendered ineffective if the Commissioner is required to seek turnover orders in the states in which the assets are located. I cannot accept this assertion as a review of the statute demonstrates that the UILA contemplates just such litigation and expressly establishes a legal structure to facilitate it.

The Appeals Court in *Mutual Benefit Life* looked closely at the purpose of the UILA finding that its adoption was intended to eliminate some of the difficulties "incurred in the liquidation and reorganization of insurance companies with assets and liabilities located in several states." *Mutual Benefit Life,* 609 A.2d at 774. The Court found that this purpose was primarily to be effected through six institutions. These institutions were identified as:

(1) the designation of the insurance commissioner of the domicile state as the receiver for an insurer; (2) authority for domiciliary receivers to proceed in non-domiciliary states; (3) vesting of title to assets in the domiciliary receiver; (4) provision for non-domiciliary creditors to have the option to proceed with claims before local ancillary receivers; (5) uniform application of the laws of the domiciliary state to the allowance of preferences among claims; and (6) prevention of preferences

---

9. Creditors must file claims in the court where the liquidation is taking place. *See e.g.* 19 Am. Jur.2d Corporations §§ 2862 and 2898.

for diligent non-domiciliary creditors with advance information.

*Id.* at 774 (citing *Twin City Bank v. Mutual Fire Marine & Inland Ins. Co.,* 646 F.Supp. 1139, 1141 (S.D.N.Y.1986), *aff'd,* 812 F.2d 713 (2d Cir.1987).

The Commissioner's effort to construe the UILA's vesting of title to assets in the domiciliary receiver ((3) above) to permit this court to assert jurisdiction over the assets in TPM's possession and order their turnover must fail. This statutory vesting allows no more than does the May 25 Order, as construed above, the vesting in the Commissioner of National Heritage's rights and interests to the extent they existed in National Heritage. Under these six remedial measures of the UILA, there is no authority for this court to order TPM to turnover the assets in question, unless this court has *in personam* jurisdiction over TPM. The UILA does not and could not effectively grant a court jurisdiction which it could not otherwise constitutionally exercise.[10]

The Commissioner's argument that the purpose of the UILA would be undermined if a single court could not order the turnover of the insurer's assets and effect a gathering of all the property is exaggerated, and is, in all events, irrelevant. To support this assertion, the Commissioner relies upon the finding in *Ballesteros* that the UILA aimed to create "a uniform, orderly and equitable method of making and processing claims against defunct insurers and ... a fair procedure to distribute the assets of defunct insurers." *Ballesteros,* 530 F.Supp. at 1370. The Commissioner further asserts that necessary to this orderly process are both the vesting of title and possession of all property in the domiciliary receiver and the centralization of the proceedings in one court.

The Commissioner, however, fails to recognize two important facts. The first is that

the UILA envisions a system of reciprocal states all operating under relatively the same or similar statutory provisions through which property in a reciprocal state can be sought. The UILA provides authority for domiciliary receivers to be vested with title to the insurer's property and to proceed on claims concerning such property in nondomiciliary states.[11] See *American Druggists' Insurance Co.,* W.D.Mich., C.A. No. G85–340, 1989 WL 513218 at 1–2, 1989 U.S. Dist. LEXIS 17719 at 5 (holding that the Court would not enforce an Ohio Court's order for the turnover of files and that under the UILA, the receiver of an Ohio insurance company could recover files from a Michigan attorney by filing suit in Michigan). Receivers of insurance companies domiciled in other states may sue in Delaware for assets located in Delaware just as receivers of Delaware insurance companies may sue in other states which have adopted the UILA, such as Nevada where TPM holds the books and records, to recover assets located in the other states.[12] This reciprocal system would not serve a purpose if within a rehabilitation a single court were expected to hear all matters concerning the recovery of out-of-state assets, even insofar as that might entail adjudication of rights of non-residents not subject to suit in the state.

Secondly, the UILA could not permit a court to assert jurisdiction where the Constitution precludes it. As stated above, TPM has not had the minimum contacts with Delaware required by the Due Process Clause to subject TPM to *in personam* jurisdiction in Delaware nor does this court have *in rem* jurisdiction over assets (e.g. papers, books, etc.) located outside the state.

\* \* \*

For these reasons I conclude that this court has jurisdiction to substitute the Com-

---

10. As determined *supra,* this court does not have *in personam* jurisdiction over TPM, nor *in rem* jurisdiction over the assets in TPM's possession.

11. *See* the UILA institutions listed in (2) and (3) above, "authority for domiciliary receivers to proceed in non-domiciliary states" and "vesting of title to assets in the domiciliary receiver," respectively.

12. The Delaware provision found at 18 Del. C. § 5914(c) states that:

> [t]he domiciliary receiver of an insurer domiciled in a reciprocal State may sue in this State to recover any assets of such insurer to which he may be entitled under the laws of this State.

The Nevada provision found at Nev.Rev.Stat. § 696B.300.3 (1993) is worded exactly the same.

missioner for National Heritage with respect to all of National Heritage's legal interests; to make orders reorganizing that entity and affecting its executory obligations under contract; but this court has no jurisdiction authorizing it to issue orders to persons who are not subject to its *in personam* jurisdiction requiring them to pay money or perform any act. Concluding that TPM is such a person I must decline to enter the order sought.