# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

<table>
<tr><td>IN THE MATTER OF THE<br>LIQUIDATION OF FREESTONE<br>INSURANCE COMPANY</td><td>)<br>)<br>)</td><td>C.A. No. 9574-VCL</td></tr>
</table>

## MEMORANDUM OPINION

Date Submitted: October 30, 2014
Date Decided: December 24, 2014

Eric Lopez Schnabel, Robert W. Mallard, Alessandra Glorioso, DORSEY & WHITNEY LLP, Wilmington, Delaware; Michael R. Stewart, Michael B. Fisco, FAEGRE BAKER DANIELS LLP, Minneapolis, Minnesota; *Attorneys for U.S. Bank National Association*.

Christopher P. Simon, Joseph Grey, CROSS AND SIMON, LLC, Wilmington, Delaware; James J. Black, III, Jeffrey B. Miceli, Mark Drasnin, BLACK & GERNGROSS, P.C., Philadelphia, Pennsylvania; *Attorneys for the Insurance Commissioner of the State of Delaware as Receiver for Freestone Insurance Company.*

**LASTER, Vice Chancellor.**

Freestone Insurance Company ("Freestone"), a Delaware-domiciled insurer, is currently in receivership under the administration of the Insurance Commissioner of the State of Delaware (the "Commissioner"). When delinquency proceedings began, Freestone maintained cash and securities valued at approximately $175 million (the "Assets") in a custodial account at U.S. Bank, N.A. As part of the delinquency proceedings, the court entered an order directing that Freestone be rehabilitated, causing title to Freestone's property to vest in the Commissioner as receiver. The court's rehabilitation order directed the Commissioner to marshal Freestone's assets and called upon third parties to turn over property belonging to Freestone to the Commissioner.

Relying on the rehabilitation order and the authority conferred by the Delaware Uniform Insurance Liquidation Act ("DUILA"), the Commissioner terminated the custodial relationship and instructed U.S. Bank to return the Assets. U.S. Bank turned over approximately $19 million but kept the rest, contending it was security for potential indemnification claims and present and future expenses. The Commissioner disputed U.S. Bank's position and threatened to seek to hold U.S. Bank in contempt of the rehabilitation order. U.S. Bank then filed the current motion, which seeks an order establishing its right to retain the Assets or, alternatively, declaring that any amounts turned over to the Commissioner will be subject to a security interest.

U.S. Bank's request for an order establishing its right to retain the Assets is denied. U.S. Bank shall turn over the Assets to the Commissioner. Before doing so, U.S. Bank may deduct from the Assets the fees and expenses it has incurred for administering the account. U.S. Bank may not deduct legal expenses. If U.S. Bank chooses not to make

1

a deduction, it shall have a security interest in the Assets equal to the amount of fees and expenses incurred for administering the account. U.S. Bank is not entitled to retain the Assets or to have a security interest in the Assets for indemnification claims or future expenses.

## I. FACTUAL BACKGROUND

The factual background is drawn from the submissions made by the parties in connection with U.S. Bank's motion. The relevant facts consist of a series of undisputed events and the details of certain agreements.

### A. The Custody Agreement

U.S. Bank held the Assets for Freestone pursuant to an Insurance Custody Agreement dated July 25, 2013 (the "Custody Agreement" or "CA"). Under the Custody Agreement, U.S. Bank's duties were ministerial in nature, *see id.* § 9, and U.S. Bank had "no duties or responsibilities except those specifically set forth" in the Custody Agreement, *id.* § 1(e). U.S. Bank held the Assets "subject to the instructions of [Freestone]," and the Assets could be withdrawn "upon the demand of [Freestone]." *Id.* § 2(b).

In Section 12 of the Custody Agreement, Freestone agreed to "(i) reimburse [U.S. Bank] for costs incurred by it hereunder, and (ii) pay to [U.S. Bank] fees for its services under this Agreement . . . ." *Id.* § 12(a). Under Section 14 of the Custody Agreement, Freestone agreed to indemnify U.S. Bank and its agents for any "Claim," defined broadly to include any cost, loss, claim, liability, or fee arising out of the agreement. *Id.* § 14(a). Under Section 17 of the Custody Agreement, "[a]ny fees or expenses [U.S. Bank] incurs

2

in responding to any Legal Action (including, without limitation, attorneys' and other professionals' fees) [could] be charged against the Account." *Id.* § 17(l). The term "Legal Action" was defined to include any "subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant or similar order relating to the Account." *Id.*

Under Section 15(a) of the Custody Agreement, either party could terminate the relationship upon 30 days written notice. *Id.* § 15(a). At that point, U.S. Bank was obligated to

> follow reasonable [Freestone] instructions concerning the transfer of the Assets; provided that:
>
> . . . .
>
> (ii) Unless required by proper regulatory agency, [U.S. Bank] shall not be required to make any delivery or payment until full payment shall have been made by [Freestone] of all liabilities constituting a charge on or against [U.S. Bank] and until full payment shall have been made to [U.S. Bank] of all its compensation, costs and expenses hereunder; and
>
> (iii) [U.S. Bank] shall have been reimbursed for any advances of monies or securities made hereunder to [Freestone] . . . .

*Id.* § 15(b).

## B.    The Commissioner Demands The Return Of The Assets

On April 24, 2014, the Commissioner filed delinquency proceedings against Freestone. By order dated April 28, 2014, the court placed Freestone into rehabilitation. Dkt. 4 (the "Rehabilitation Order"). The Rehabilitation Order instructed the Commissioner to take "exclusive possession and control of" Freestone's property. *Id.* ¶ 6. To facilitate the Commissioner's efforts, the Rehabilitation Order instructed parties holding Freestone's property to turn it over to the Commissioner. *Id.* ¶ 13.

3

In May 2014, the Commissioner demanded the return of the Assets. U.S. Bank turned over cash and securities worth approximately $19 million, but kept the remaining $156 million. U.S. Bank justified its refusal on the theory that it may face potential claims arising out of its services to Freestone or otherwise be drawn into litigation involving Freestone. If that happens, then U.S. Bank anticipates making a claim for indemnification against Freestone under the Custody Agreement. U.S. Bank also anticipates incurring expenses as it continues to maintain the account.

In addition to its right to indemnification under the Custody Agreement, U.S. Bank cited trust agreements pursuant to which U.S. Bank held assets to secure obligations between Freestone and other insurance companies (the "Trust Agreements"). In each case, either Freestone or another insurance company acted as a reinsurer, and U.S. Bank held the assets in trust to secure the insurer's right to payment from the reinsurer. U.S. Bank provided examples of three Trust Agreements:

- *The White Rock Trust Agreement*. Pursuant to a trust agreement dated January 1, 2012, White Rock Insurance (SAC) Ltd ("White Rock") deposited cash and securities with U.S. Bank for the benefit of Freestone. U.S. Bank's duties and responsibilities under the agreement were "entirely administrative and not discretionary and determined only with reference to this Agreement and Applicable Insurance Law." *Id.* § 8(n). White Rock was obligated to reimburse U.S. Bank for its fees and costs. If White Rock failed to pay, then U.S. Bank could recover its fees and costs out of trust income. *Id.* § 9. The White Rock Trust Agreement was governed by New York law. *Id.* § 13.

- *The Companion Trust Agreement.* Pursuant to a trust agreement dated December 28, 2012, Freestone deposited cash and securities with U.S. Bank for the benefit of Companion Property and Casualty Insurance Company. U.S. Bank's duties and obligations were "only . . . such as are specifically set forth in [the] Agreement, as it may from time to time be amended, and no implied duties or obligations shall be read into this Agreement against the Trustee." *Id.* § 7(i). Freestone was obligated to reimburse U.S. Bank for its fees and costs. *Id.* § 8(a). If Freestone failed to pay,

4

then U.S. Bank could recover its fees and costs out of trust assets. *Id.* The Companion Trust Agreement was governed by South Carolina law. *Id.* § 12.

● *The Accident Trust Agreement.* Pursuant to a trust agreement dated September 25, 2013, Freestone deposited cash and securities with U.S. Bank for the benefit of Accident Insurance Company. U.S. Bank's duties were "entirely administrative and not discretionary and determined only with reference to this Agreement and Applicable Insurance Law. *Id.* § 8(n). Freestone was obligated to reimburse U.S. Bank for its fees and costs. *Id.* § 9(a). If Freestone failed to pay, then U.S. Bank could recover its fees and costs out of the trust income. *Id.* § 9(b). The Accident Trust Agreement was governed by Delaware law. *Id.* § 13.

U.S. Bank believes that its security interest extends not only to claims under the Custody Agreement, but also to claims under the Trust Agreements.

U.S. Bank does not believe it has done anything that would warrant a lawsuit, much less result in liability, and U.S. Bank has not attempted to quantify its exposure to any claims. Given that each agreement defined U.S. Bank's duties as exclusively ministerial and limited to the contractual obligations set forth in the agreement, U.S. Bank would not seem to be at great risk. Nevertheless, U.S. Bank believes it is entitled to hold almost 90% of the Assets, worth approximately $156 million, because it is possible that a claim might be made. As a practical matter, that means U.S. Bank will hold the Assets for what might be years, until U.S. Bank feels confident that the relevant statutes of limitations have run or U.S. Bank receives releases in the interim from the parties who might assert claims.

## C.     The Current Motion

U.S. Bank and the Commissioner attempted without success to work out their differences. After the Commissioner took the position that U.S. Bank would be in

contempt of the Rehabilitation Order if it did not return the Assets, then U.S. Bank filed the current motion.

On July 22, 2014, in response to a request by the Commissioner, the court transitioned Freestone out of rehabilitation and into liquidation. *See* Dkt. 68 (the "Liquidation Order"). The Liquidation Order repeated the directives that the Commissioner secure Freestone's property and that any party holding Freestone's property turn it over to the Commissioner. *Id.* ¶¶ 3, 10. The Liquidation Order set a bar date of December 31, 2015, for creditors to file claims with the Commissioner. *Id.* ¶ 16.

## II. LEGAL ANALYSIS

When an insurer enters delinquency proceedings, the DUILA vests title to its property in the Commissioner, acting as receiver:

> [T]he Commissioner shall be vested by operation of law with the title to all of the property, contracts and rights of action and all of the books and records of the insurer, wherever located, as of the date of entry of the order directing the Commissioner to rehabilitate or liquidate a domestic insurer or to liquidate the United States branch of an alien insurer domiciled in this State, and the Commissioner shall have the right to recover the same and reduce the same to possession, except that ancillary receivers in reciprocal states shall have, as to assets located in their respective states, the rights and powers which are herein prescribed for ancillary receivers appointed in this State as to assets located in this State.

18 *Del. C.* § 5913(b). The DUILA provides that any rehabilitation order "shall direct the Commissioner forthwith to take possession of the property of the insurer and to conduct the business thereof and to take such steps toward removal of the causes and conditions which have made rehabilitation necessary as the court may direct." 18 *Del. C.* § 5910(a). The DUILA similarly provides that any liquidation order "shall direct the Commissioner

6

forthwith to take possession of the property of the insurer [and] to liquidate its business." 18 *Del. C.* § 5911(a).

In this case, Freestone entered rehabilitation on April 28, 2014, at which point the Commissioner became vested by operation of law with title to all of Freestone's "property, contracts and rights of action . . ., wherever located." 18 *Del. C.* § 5913(b). As of that date, the Commissioner gained title to the property possessed by Freestone under the Custody Agreement and the three Trust Agreements. The Rehabilitation Order instructed the Commissioner to take "exclusive possession and control of" Freestone's property. Rehabilitation Order ¶ 6. To facilitate the Commissioner's task, the Rehabilitation Order called upon parties holding Freestone's property to turn it over to the Commissioner. *Id.* ¶ 13. By terminating the Custody Agreement and demanding the return of the Assets from U.S. Bank, the Commissioner was fulfilling her obligations under the statute and the Rehabilitation Order. The Liquidation Order confirmed and reiterated that the Commissioner held title to Freestone's property, that the Receiver should take exclusive possession and control of Freestone's property, and that other parties holding Freestone's property should turn it over to the Commissioner. Liquidation Order ¶¶ 6, 13.

Although the Rehabilitation Order and the Liquidation Order vested title to Freestone's property in the Commissioner, those orders only gave the Commissioner the same rights that Freestone possessed. *In re Rehab. of Nat'l Heritage Life Ins. Co.*, 656 A.2d 252, 256 (Del. Ch. 1994). As receiver, the Commissioner did not gain greater rights than Freestone had. *Id.* The Commissioner therefore obtained the right under the Custody

7

Agreement to instruct U.S Bank to turn over the Assets to the same degree that Freestone could have insisted upon their return.

The Custody Agreement provided generally that Freestone could obtain return of the Assets on demand. Section 2(b) stated that the "Assets shall be held subject to the instructions of [Freestone] or [Freestone's] agent and upon [U.S. Bank's] receipt of Appropriate Instructions shall be withdrawable upon the demand of [Freestone] or [Freestone's] agent." CA § 2(b). In addition, Section 15(a) stated that either party could terminate the relationship upon 30 days written notice. *Id.* § 15(a). U.S. Bank agreed that, that upon termination, it "shall follow reasonable [Freestone] instructions concerning the transfer of the Assets," subject to the conditions that

> (ii) [u]nless required by proper regulatory agency, [U.S. Bank] shall not be required to make any delivery or payment until full payment shall have been made by [Freestone] of all liabilities constituting a charge on or against [U.S. Bank] and until full payment shall have been made to [U.S. Bank] of all its compensation, costs and expenses hereunder; and

> (iii) [U.S. Bank] shall have been reimbursed for any advances of monies or securities made hereunder to [Freestone] . . . .

*Id.* § 15(b). U.S. Bank does not dispute that the Commissioner is "a proper regulatory agency."

Rather than returning the Assets, U.S. Bank has taken the position that it has a valid security interest in the Assets that secures U.S. Bank's rights to claims it has or might have in the future against Freestone under the Custody Agreement and under other agreements between U.S. Bank and Freestone, such as the Trust Agreements. U.S. Bank describes its claims as falling into two categories: (i) claims for indemnification that U.S.

8

Bank might have if it were brought into any dispute relating to the Trust Agreements, and (ii) claims for fees and expenses incurred by U.S. Bank while continuing to administer the custodial account and custody agreements. The category of indemnification claims does not include any present claims or current amounts. U.S. Bank concedes that any indemnification claims it might have are contingent, unmatured, unliquidated, and unasserted. The reference to fees and expenses appears to include (i) fees U.S. Bank charged and the expenses it incurred for actual administration of the custodial account ("Administrative Fees") and (ii) legal fees incurred by U.S. Bank relating to Freestone's receivership and associated disputes ("Legal Fees"). U.S. Bank has represented that it has accrued some fees and expenses to date ("Current" fees), but also that it will continue to accrue fees and expenses in the future ("Future" fees).

Minnesota law governs the Custody Agreement. CA § 17(g). Under Minnesota law, unambiguous contract terms must be given their "plain and ordinary meaning." *Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 328 (Minn. 1993). When construing contract terms, the language "must be read in the context of the entire contract." *Quade v. Secura Ins.*, 814 N.W.2d 703, 705 (Minn. 2012). "[T]he expression of specific things in a contract implies the exclusion of all not expressed." *Am. Nat. Bank of Minn. v. Hous. & Redevelopment Auth. for City of Brainerd*, 773 N.W.2d 333, 338 (Minn. Ct. App. 2009) (internal quotations omitted).

## A. The Plain Language Of Section 15(b)

Under the plain language of Section 15(b), U.S. Bank must return the Assets to the Receiver. Section 15(b) required U.S. Bank to "follow reasonable . . . instructions

9

concerning the transfer of the Assets" upon termination of the Custody Agreement, subject to the conditions that

> (ii) [u]nless required by proper regulatory agency, [U.S. Bank] shall not be required to make any delivery or payment until full payment shall have been made by [Freestone] of all liabilities constituting a charge on or against [U.S. Bank] and until full payment shall have been made to [U.S. Bank] of all its compensation, costs and expenses hereunder; and

> (iii) [U.S. Bank] shall have been reimbursed for any advances of monies or securities made hereunder to [Freestone] . . . .

*Id.* Under Section 15(b)(ii), if "required by a proper regulatory agency," then U.S. Bank can be "required to make . . . delivery" of the Assets *before* "full payment shall have been made . . . of all liabilities constituting a charge on or against" U.S. Bank. Likewise, if "required by a proper regulatory agency," then U.S. Bank can be "required to make . . . delivery" of the Assets *before* "full payment shall have been made . . . of all [U.S. Bank's] compensation, costs and expenses hereunder." The Commissioner is "a proper regulatory agency" empowered to terminate the Custody Agreement and demand return of the Assets without the holdbacks contemplated by Section 15(b)(ii).

U.S. Bank's contingent, unmatured, unliquidated, and unasserted claims for indemnification do not yet represent a liability constituting a "charge on or against" U.S. Bank. The term "charge" contemplates an actual monetary amount "on or against" U.S. Bank that could be reflected on U.S. Bank's general ledger or financial statements. Assuming they did rise to that level, U.S. Bank could not withhold those amounts in the face of a demand from a proper regulatory agency. U.S. Bank's claims for Administrative Fees fall within the plain meaning of "compensation, costs and expenses hereunder" that

10

U.S. Bank cannot withhold in the face of a demand by a proper regulatory agency. U.S. Bank therefore cannot rely on either category of claim to avoid its obligations under Section 15(b).

Under Section 15(b)(iii), U.S. Bank potentially could decline to return the Assets until U.S. Bank had been "reimbursed for any advances of monies or securities made hereunder to" Freestone. Section 15(b)(iii) does not include a provision overriding this requirement in the case of a request by a proper regulatory agency, so the Commissioner's status as a regulator does not alter U.S. Bank's ability to withhold funds. This case, however, does not implicate Section 15(b)(iii), because U.S. Bank has not identified any outstanding amounts that it advanced for "monies or securities made hereunder to" Freestone. This concept refers to amounts of funds or securities that Freestone has advanced as a result of trading in the custodial account. Section 12(b) of the Custody Agreement describes the types of transactions that it contemplates:

> If any advance of funds is made by [U.S. Bank] on behalf of [Freestone] to purchase, or to make payment on or against delivery of securities or there shall arise for whatever reason an overdraft in the Account, or if [Freestone] is for any other reason indebted to [U.S. Bank], including, but not limited to, any advance of immediately available funds to [Freestone] with respect to payments to be received by [U.S. Bank] in next-day funds (which [Freestone] acknowledges [Freestone] is liable to repay if [U.S. Bank] does not receive final payment), [Freestone] agrees to repay [U.S. Bank] on demand the amount of the advance, overdraft or other indebtedness and accrued interest at a rate per annum . . . equal to the Federal Funds rate in effect at the time.

CA § 12(b). None of the claims that U.S. Bank has identified relates to this type of transaction.

11

Consequently, under Section 15(b), upon termination of the Custody Agreement, U.S. Bank was obligated to return the Assets to the Commissioner. Having not yet returned all of the Assets, U.S. Bank must do so now.

**B.     The Plain Language Of Section 12(e)**

As its principal argument in favor of retaining the Assets, U.S. Bank relies on Section 12(e) of the Custody Agreement, which U.S. Bank believes gives U.S. Bank a security interest in all of the Assets. Section 12(e) states that "[t]o secure payment obligations under this Section 12 or in any other agreement between [Freestone] and [U.S. Bank], [Freestone] does hereby grant to [U.S. Bank] a security interest in all Assets up to the amount of any deficiency or other indebtedness to [U.S. Bank]." Because Section 12(e) extends only to "payment obligations," whether arising under the Custody Agreement or another agreement, this decision refers to that section as the "Payment Obligation Provision." The success of U.S. Bank's argument depends on the scope of the security interest created by the Payment Obligation Provision.

**1.     The Plain Meaning Of "Payment Obligation"**

Section 12(e) grants U.S. Bank a security interest "to secure payment obligations under this Section 12 or any other agreement between [Freestone] and [U.S. Bank]." When the term "payment obligation" is applied in the context of the Custody Agreement, its scope does not extend to claims for indemnification or Legal Fees.

If viewed in the abstract, untethered from the language of the Custody Agreement, then the words "payment obligations" could be read broadly. The phrase does not appear to have a settled legal meaning, whether under Minnesota law or otherwise. The parties

12

have not identified any cases addressing the term, and Black's Law Dictionary does not define it as such. Black's Law Dictionary does define a "payment" as the "[p]erformance of an obligation by the delivery of money . . . accepted in partial or full discharge of the obligation." BLACK'S LAW DICTIONARY 1243 (9th ed. 2009). It defines an obligation as a "legal or moral duty to do or not do something" or a "binding agreement or acknowledgement of a liability to pay a certain amount . . . ." *Id.* at 1179. In theory, therefore, the words "payment obligation" could encompass any type of claim.

But the words being interpreted in this motion do not exist in a vacuum. They appear in Section 12 of the Custody Agreement, titled "Compensation and Reimbursement." That section provides in totality as follows:

> (a) [Freestone] shall (i) reimburse [U.S. Bank] for costs incurred by it hereunder, and (ii) pay [U.S. Bank] fees for its services under this Agreement . . . .
>
> (b) If any advance of funds is made by [U.S. Bank] on behalf of [Freestone] to purchase, or to make payment on or against delivery of securities or there shall arise for whatever reason an overdraft in the Account, or if [Freestone] is for any other reason indebted to [U.S. Bank], including, but not limited to, any advance of immediately available funds to [Freestone] with respect to payments to be received by [U.S. Bank] in next-day funds (which [Freestone] acknowledges [Freestone] is liable to repay if [U.S. Bank] does not receive final payment), [Freestone] agrees to repay [U.S. Bank] on demand the amount of the advance, overdraft or other indebtedness and accrued interest at a rate per annum . . . equal to the Federal Funds rate in effect at the time.
>
> (c) In the event of an advance of funds by [U.S. Bank], or if any overdraft is created by Account transactions, or if [Freestone] is otherwise in default of any obligation to [U.S. Bank], [U.S. Bank] may directly charge the Account and receive payment therefrom.

(d) In the event that a compensation payment due [U.S. Bank] is past due by more than 30 days, the amount may be charged to the Account and [U.S. Bank] may receive payment therefrom.

(e) *To secure the payment obligations under this Section 12 or in any other agreement between [Freestone] and [U.S. Bank],* [Freestone] does hereby grant to [U.S. Bank] a security interest in all Assets up to the amount of any deficiency or other indebtedness to [U.S. Bank].

(f) None of the provisions of this Agreement shall require [U.S. Bank] to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers hereunder, if [U.S. Bank] believes that repayment of funds, or indemnity satisfactory to [U.S. Bank] against such risk or liability, is not assured.

CA § 12 (emphasis added).

The term "payment obligations" thus appears in one subsection of a larger section addressing compensation and reimbursement and as part of the phrase "payment obligations under this Section 12 or in any other agreement." So located, the term "payment obligations" cannot mean any obligation of any kind. Rather, it refers to the types of payments contemplated by Section 12, which are (i) costs incurred by U.S. Bank in providing the limited administrative services contemplated by the Custody Agreement, (ii) fees charged for those services, (iii) advances of funds by U.S. Bank to make payment on or against delivery of securities, and (iv) overdrafts in the account.

So read, the term "payment obligations" does not include claims for indemnification. The locus of the indemnification obligations in the Custody Agreement reinforces this reading. Freestone's obligation to indemnify U.S. Bank is found in Section 14, which is titled "Indemnification." By defining the payment obligations secured by the Assets as those arising "under this Section 12," the drafters of Section 12(e) excluded

14

obligations found in other sections of the agreement, such as the indemnification obligations found in Section 14. Had the drafters intended to extend the security interest in Section 12(e) to claims for indemnification, it would have been an easy matter to have left out the words "under this Section 12," to have referred to "obligations under this Agreement," or to have referenced Section 14 specifically. Under Minnesota law, "a party that fails to include a term in a contract is bound by the agreement and cannot use extrinsic evidence to alter unambiguous contract language." *Am. Bank of St. Paul v. Coating Specialties, Inc.*, 787 N.W.2d 202, 205 (Minn. Ct. App. 2010).

The same logic teaches that the term "payment obligations" does not encompass Legal Fees. Section 17(l) of the Custody Agreement states:

> If [U.S. Bank] is served with a subpoena, restraining order, writ of attachment or execution, [etc.,] relating to the Account (a "Legal Action"), [U.S. Bank] will comply with that Legal Action . . . . *Any fees or expenses [U.S. Bank] incurs in responding to any Legal Action* (including, without limitation, attorneys' and other professionals' fees) *may be charged against the Account.*

CA § 17(l) (emphasis added). Once again, the scope of the "payment obligations" secured by the Payment Obligation Provision is limited to those arising "under . . . Section 12." It does not encompass the obligations created by Section 17(l). The Custody Agreement reinforces this limitation on the scope of the Payment Obligation Provision by stating directly in Section 17(l) that fees and expenses for any Legal Action "may be charged" against the Assets. If that right already existed as a payment obligation under Section 12, then Section 17(l) would not have to address that subject.

By contrast, the Payment Obligation Provision does appear to encompass Administrative Fees, although for reasons discussed in the next section, only to the extent they are Current Administrative Fees. The Custody Agreement, read as a whole, makes clear that the plain meaning of the term "payment obligations" refers to the categories of compensation and reimbursement identified in Section 12, which are (i) costs incurred by U.S. Bank in providing the services contemplated by the Custody Agreement, (ii) fees for the services provided under the Custody Agreement, (iii) advances of funds by U.S. Bank to make payment on or against delivery of securities, and (iv) overdrafts in the account. Although U.S. Bank only has described its Administrative Fees in general terms, they appear to fall within the first two categories in this list.

It is true that Section 12(b) of the Custody Agreement also refers generally to "other indebtedness" that may arise "for any other reason," but U.S. Bank cannot rely on that language to encompass indemnification obligations or Legal Fees. First, to do so would write out the limitation of Section 12(e) to obligations arising "under this Section 12," as opposed to obligations arising under other sections of the Custody Agreement. Second, under the principle of *ejusdem generis*, general language must be read consistently with more specific language. *See Lefto v. Hoggsbreath Enterprises, Inc.,* 581 N.W.2d 855, 858 (Minn. 1998) ("General words are construed to be restricted in their meaning by preceding particular words." (internal quotations omitted)). The "other indebtedness" contemplated by Section 12 is therefore limited to the types of payment and reimbursements contemplated by Section 12, not other, unrelated types of indebtedness.

By its terms, the security interest created by the Payment Obligation Provision does not extend to U.S. Bank's claims for indemnification or Legal Fees. U.S. Bank cannot rely on those categories of claims to support a security interest in the Assets.

## 2. The Plain Meaning Of "Amount"

Just as the security interest in Section 12(e) only extends to "payment obligations," it also only applies "*up to the amount* of any deficiency or other indebtedness to [U.S. Bank]." CA § 12(e) (emphasis added). U.S. Bank has not made a claim for any amount, although it has represented that it has incurred Current Administrative Fees and Current Legal Fees. U.S. Bank concedes that its claims for indemnification are contingent, unmatured, unliquidated, and unasserted, as are its claims for Future Administrative Fees and Future Legal Fees.

The Supreme Court of Minnesota has interpreted the term "amount" to refer to a measurable quantum of value.[1] In other contexts, Minnesota courts have construed terms such as "amount due" narrowly to refer only to the amount of money then due and not to other amounts, such as fees and charges or additional amounts due upon acceleration.[2] To

---

[1] *See In re Tveten*, 402 N.W.2d 551, 556-58 (Minn. 1987) (holding that a reference in the Minnesota Constitution to a "reasonable amount" required some quantifiable value limitation); *How v. How*, 61 N.W. 456, 457 (Minn. 1894) (same).

[2] *See Davis v. Davis*, 196 N.W.2d 473, 474-75 (Minn. 1972) (interpreting a provision permitting a borrower to a cure default upon tender of the "amount actually due" to mean the amount then presently due absent acceleration); *Riverview Muir Doan LLC v. JADT Dev. Gp. LLC*, 776 N.W.2d 172, 178 (Minn. Ct. App. 2009) (construing "original principal amount secured by the mortgage" to mean "the greatest principal balance actually due at any time during the term of the loan"); *Shakopee Ford, Inc. v. Wittenburg*, 371 N.W.2d 56, 58 (Minn. Ct. App. 1985) (holding that ordinary meaning of

17

the extent U.S. Bank is owed a payment obligation, the security interest covers the entire payment obligation, *i.e.*, it exists "up to the amount of any deficiency or other indebtedness to [U.S. Bank]." The reference to a "deficiency or other indebtedness" implies a specific, quantified amount, not a presently unknown, unspecified, contingent amount that might become certain in the future.

By its terms, the security interest created by the Payment Obligation Provision does not extend to U.S. Bank's claims for indemnification, Future Administrative Fees, or Future Legal Fees. The term "payment obligation" only refers to present amounts. Although U.S. Bank has not specified the amounts for purposes of its motion, U.S. Bank is entitled to a security interest equal to its Current Administrative Fees.

### 3. The Plain Meaning of "Other Agreements"

The security interest granted by the Payment Obligation Provision extends to payment obligations existing under "any other agreement between [Freestone] and [U.S. Bank]." U.S. Bank correctly contends that the Trust Agreements are "other agreements."

The plain language of the Payment Obligation Provision extends to "any other agreements" between Freestone and U.S. Bank. The Commissioner argues that this language means other agreements that are between *only* Freestone and U.S. Bank, not multi-party agreements where Freestone and U.S. Bank are among the parties. The

---

term "amount of credit" referred only to amount borrowed and not finance charges or other costs of credit).

18

Commissioner contends that the Trust Agreements are excluded because each is a three-party agreement with an additional insurer among the signatories.

The term "other agreements" plainly encompasses any other agreement that establishes obligations between Freestone and U.S. Bank. The Payment Obligation Provision does not include a modifier such as "only" that would restrict its coverage to two-party agreements. Had Freestone and U.S. Bank intended to limit Section 12(e) to bilateral arrangements, they could have done so.

This reading of "other agreement" does not mean, however, that the Payment Obligation Provision automatically extends to every "other agreement" to which Freestone and U.S. Bank are parties. The Accident Trust Agreement, for example, cannot constitute an "other agreement" for purposes of Section 12(e) because it was executed after the Custody Agreement and contains an integration clause. Section 16 of the Accident Trust Agreement states that "[t]his Agreement constitutes the entire agreement among the Parties relating to the subject matter hereof, and there are no understandings or agreements . . . that are not fully expressed in this Agreement." The Custody Agreement was an earlier agreement rendered inapplicable by the integration clause. *Peden v. Gray*, 2005 WL 2622746, at *2 (Del. 2005) (TABLE) ("The parol evidence rule bars evidence of additional terms to a written contract, when that contract is a complete integration of the agreement of the parties." (internal quotations omitted)). The White Rock Trust Agreement and the Companion Trust Agreement, by contrast, preceded the Custody Agreement and therefore could be "other agreements" referenced in the Payment Obligation Provision.

Although the Payment Obligation Provision extends to the White Rock Trust Agreement and the Companion Trust Agreement, it only grants U.S. Bank a security interest to the extent of any payment obligations due under those agreements. The term "payment obligations" as applied to the White Rock Trust Agreement and the Companion Trust Agreement has the same meaning as under the Custody Agreement. It does not extend to indemnification obligations or to future fees.

The White Rock Trust Agreement cannot give rise to any "payment obligations" on behalf of Freestone because White Rock, not Freestone, is solely responsible for paying pay all of U.S. Bank's fees. The Companion Trust Agreement, by contrast, can give rise to payment obligations on behalf of Freestone, because Freestone is obligated to pay U.S. Bank's compensation under that agreement.

### 4. The Scope Of The Security Interest

The security interest granted by the Payment Obligation Provision extends only to Current Administrative Fees. To determine what Administrative Fees are current, the operative date is thirty days after the Receiver demanded that U.S. Bank return the Assets. The Receiver's demand operated as a notice of termination pursuant to Section 15(a) of the Custody Agreement, which provides that the "Agreement shall remain in effect until terminated by either party giving written notice 30 days in advance of the termination date." CA § 15(a). U.S. Bank was entitled to continue accruing Administrative Fees until the termination date. U.S. Bank does not have a security interest that covers its indemnification claims, Future Administrative Fees, or Legal Fees.

C. DUILA Section 5918(d)

20

As its final bases for retaining the Assets, U.S. Bank relies on two sections of the DUILA. Neither alters the analysis.

U.S. Bank first cites Section 5918(d) of the DUILA, 18 *Del. C.* § 5918(d). That subsection states that

> [t]he owner of a secured claim against an insurer for which a receiver has been appointed in this or any other state may surrender his/her security and file a claim as a general creditor, or the claim may be discharged by resort to the security, in which case the deficiency, if any, shall be treated as a claim against the general assets of the insurer on the same basis as claims of unsecured creditors.

18 *Del. C.* § 5918(d). U.S. Bank contends that under Section 5918(d), U.S. Bank must be permitted to retain its security because otherwise it would be reduced to the status of a general creditor and denied the election that Section 5918(d) permits. But Section 5918(d) does not authorize a party to retain security indefinitely as part of an election process. The subsection appears in a section titled "Priority of certain claims." The subsection ensures that a secured party can execute on its security and, if there is a deficiency, seek to recover any deficiency as an unsecured creditor. U.S. Bank can make that election now.

U.S. Bank also relies on Section 5928(a), which provides as follows:

> (a) No contingent and unliquidated claim shall share in a distribution of the assets of an insurer which has been adjudicated to be insolvent by an order made pursuant to this chapter, except that such claim shall be considered, if properly presented, and may be allowed to share where:
>
> > (1) Such claim becomes absolute against the insurer on or before the last day for filing claims against the assets of such insurer . . . .

21

18 *Del. C.* § 5928(a). U.S. Bank argues that it should not have to take any action until the time comes to make such a claim, which is the bar date of December 31, 2015. By that point, some of its currently contingent, unmatured, unliquidated, and unasserted claims might at least be asserted.

This argument does not go very far because the plain language of the Custody Agreement does not grant U.S. Bank a security interest for indemnification claims or Legal Fees. Whether claims falling into those categories might accrue by the bar date is irrelevant, because U.S. Bank lacks a security interest in those claims in any event. The only category where the bar date might matter is Administrative Fees, where U.S. Bank does have a security interest. But because the Commissioner has demanded the return of the Assets and terminated the custodial relationship, U.S. Bank's ability to incur Administrative Expenses ceased thirty days after the Commissioner's demand. No additional Administrative Expenses can be incurred.

## III. CONCLUSION

U.S. Bank shall turn over the Assets to the Commissioner. U.S. Bank is not entitled to retain indefinitely, potentially for years, property valued at $156 million. Such an interpretation would strike out Section 2(b) of the Custody Agreement, which requires that U.S. Bank hold the Assets "subject to the instructions of" Freestone and return the Assets on demand, as well as Section 15(b) of the Custody Agreement, which requires that U.S. Bank "follow reasonable [Freestone] instructions concerning the transfer of the Assets" upon termination. In place of these provisions, U.S. Bank would gain the right to continue holding the Assets until U.S. Bank concluded that all statutes of limitations had

22

run or until U.S. Bank received releases that it found adequate. As a practical matter, U.S. Bank's interpretation would re-write the Custody Agreement to say that U.S. Bank need only return the Assets if, in its sole discretion, U.S. Bank feels sufficiently secure. That is not what the Custody Agreement says.

Before returning the Assets, U.S. Bank may deduct its Current Administrative Fees to the extent incurred as of a date thirty days after the date that the Commissioner demanded the return of all of the Assets. If U.S. Bank elects to turn over the Assets without any deduction, then U.S. Bank has a security interest in the Assets in that amount. The Payment Obligation Provision does not grant U.S. Bank a greater security interest than that.