# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TERRAMAR RETAIL CENTERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12875-VCL |
| | ) | |
| MARION #2-SEAPORT TRUST U/A/D/ | ) | |
| JUNE 21, 2002 | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: July 18, 2017
Date Decided: August 18, 2017

Kenneth J. Nachbar, Lauren Neal Bennett, Colleen W. Hill, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Richard A. Heller, PROCOPIO, CORY, HARGREAVES & SAVITCH LLP, San Diego, California; *Counsel for Terramar Retail Centers, LLC*.

Thad J. Bracegirdle, WILKS LUKOFF & BRACEGIRDLE, LLC; *Counsel for Marion #2-Seaport Trust U/A/D/ June 21, 2002*.

**LASTER, Vice Chancellor.**

Defendant Marion #2-Seaport Trust U/A/D June 21, 2002 (the "Trust") is an investment vehicle affiliated with non-party Michael Cohen. The Trust holds a 25% member interest in Seaport Village Operating Company, LLC (the "Company"), which is a Delaware limited liability company. Cohen negotiated the terms of the underlying business deal that was implemented through the formation of the Company. He also negotiated the terms of the Company's operating agreement.

Plaintiff Terramar Retail Centers, LLC ("Terramar") holds a 75% member interest in the Company. Terramar seeks declarations that it (i) properly exercised a buy-out provision, (ii) has the power to dissolve the Company and can sell the Company's property and assets in its sole discretion, and (iii) can distribute the proceeds in accordance with its interpretation of a waterfall provision in the Company's operating agreement.

The Trust moved to dismiss the action pursuant to Court of Chancery Rule 12(b)(2).[1] According to the Trust, a Delaware court cannot exercise personal jurisdiction over the Trust for purposes of Terramar's suit to enforce the operating agreement.

---

[1] The Trust also argued that this dispute was not ripe. On the day before oral argument on the motion to dismiss, the Trust submitted a copy of a complaint it filed in the Superior Court of the State of California for the County of Los Angeles in which the Trust sought declarations that (i) Terramar had not validly exercised the buy-out provision, which in turn means that Terramar cannot dissolve the Company and (ii) the waterfall provision in the Company's operating agreement gives the Trust a priority claim to the Company's cash flows and any sales proceeds. *See* Dkt. 44, Ex. ¶¶ 70-71. The Trust's decision to seek declaratory judgments on these issues in California rendered moot its contention that Terramar's suit to obtain comparable declarations in this court was not ripe for resolution.

The motion to dismiss is denied.

## I. FACTUAL BACKGROUND

The facts are drawn from Terramar's Amended and Supplemental Complaint (the "Complaint") and the documents that the parties submitted in connection with the motion to dismiss.[2] The court has taken judicial notice of prior proceedings in a related action between Terramar and a third member of the Company. On a motion to dismiss for lack of personal jurisdiction, "the record is construed in the light most favorable to the plaintiff."[3]

### A. Seaport Village

Seaport Village is a specialty shopping center and tourist attraction in San Diego, California. The Port of San Diego owns the land on which Seaport Village operates. Seaport Village was developed beginning in 1978, when the Taubman family secured a forty-year lease on the land. The Taubman family used San Diego Sea Port Village, Ltd. ("Limited"), a California limited partnership, as its vehicle for entering into the lease and developing the property.

To finance the development of Seaport Village, Limited borrowed $40 million from The Yasuda Trust & Banking Company, Ltd., a Japanese bank (the "Yasuda

---

[2] *See Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008) (noting that on a motion to dismiss for lack of personal jurisdiction "[t]he court may consider the pleadings, affidavits, and any discovery of record").

[3] *Id.*

Loan"). In 1998, Limited defaulted on the Yasuda Loan. By this point, Anne Taubman had become the principal of Limited.

Taubman engaged Cohen to help her refinance Limited's obligations. Cohen is a real estate professional who sources capital for real estate transactions.[4]

With Cohen's assistance, Taubman formed San Diego Seaport Lending Co., LLC ("Lending"), a Delaware limited liability company. Lending borrowed $24 million , then used the proceeds to purchase the Yasuda Loan.

As part of the restructuring, Cohen, Limited, Lending, and Taubman entered into a consulting agreement. The agreement is complex, but in substance it gave Cohen the right to receive cash flows from Limited and Lending that mimicked a 50% interest in those entities. Taubman personally guaranteed the payments to Cohen. As the consulting agreement specified, Cohen did not receive, and never held, actual member interests in Limited or Lending. Instead, he became a party to a contract that gave him cash-flow rights similar to what he would have received if he owned a 50% equity interest in Limited and Lending.

**B.      The Terramar Transaction**

By 2002, Limited needed additional capital. Cohen secured additional capital from Terramar, a real estate development company.[5] To implement the recapitalization, Cohen,

---

[4] *See* Dkt. 31, Ex. D at 19:6-7.

[5] At the time, Terramar was known as GMS Realty. For simplicity, this opinion consistently refers to the entity as "Terramar."

Taubman, and Terramar formed the Company. Terramar received 50% of the member interests in the new entity and became its manager. In return, Terramar (i) made a capital contribution of $7 million, (ii) guaranteed half of the outstanding balance of Lending's outstanding loan, (iii) took over the management of Seaport Village, and (iv) agreed to seek to renew the lease with the Port of San Diego and to attempt to obtain a lease from the Port for an adjacent property.

Cohen and Taubman received the other 50% of the member interests in the Company, which they split 50/50 in accordance with their effective split of the cash-flow rights from Limited and Lending. To hold his 25% member interest, Cohen formed the Trust. Taubman held her 25% member interest through Limited.

To govern the business and affairs of the Company and further specify the terms of the investment, the Trust, Limited, and Terramar entered into an operating agreement dated September 1, 2002 (the "Operating Agreement"). The preamble to the Operating Agreement recited that the members "wish[ed] to form a Delaware limited liability company for the purpose and on the terms and conditions set forth herein."[6] The Operating Agreement declared that the Company was "formed as a limited liability company pursuant to the provisions of the [Delaware Limited Liability Company] Act" and that its existence "commence[d] upon the filing for record of the Company's Certificate with the Delaware Secretary of State . . . ."[7] The Operating Agreement further

---

[6] Dkt 26, Ex. A. at 1.

[7] *Id.* at 8-9.

specified that the Delaware Limited Liability Company Act governs "[t]he rights and obligations of the Members and the affairs of the Company . . . ."[8]

The Operating Agreement named Terramar as the Company's sole manager with "full, exclusive, and complete discretion to manage and control the business affairs of the Company . . . ."[9] Neither the Trust nor Limited received "any right, power, or authority to transact any business in the name of the Company, take part in the day-to-day management or the operation or control of the business and affairs of the Company, or act for or on behalf of or to bind the Company."[10]

Under the Operating Agreement, Cohen received an exclusive right to broker any future financing for Seaport Village.[11] Terramar received the right to a preferential return of 11.5% per year on its capital contribution of $7 million before the Company could make any distributions to its members in proportion to their member interests.[12] Terramar also received a right to request that the other members buy out its member interest at fair market value at any time after January 1, 2006 (the "Put Right"). The Operating Agreement established a series of procedures to determine fair market value. To put teeth into the Put Right, Terramar had the right to dissolve the Company and receive a

---

[8] *Id.* at 8.

[9] *Id.* at 19.

[10] *Id.* at 20-21.

[11] *Id.*

[12] *Id.* at 15.

contractually determined payout if the members did not purchase Terramar's interest within six months (the "Dissolution Right").[13]

Terramar insisted upon the Put Right and the Dissolution Right as a condition of its investment. During the negotiations, Terramar's counsel called out the provisions in an e-mail to Taubman's counsel and emphasized that Terramar was "not willing to enter into the transaction without a clear exit strategy."[14] The email was forwarded to Cohen.[15]

## C.    Disputes Arise.

Over the years, the Company's members disagreed over various matters. In April 2012, Limited sued Terramar in the Superior Court of the State of California for the County of San Diego seeking the dissolution of the Company. In August 2013, the California court held that any claim for dissolution must be brought in Delaware.

In August 2013, Limited sued Terramar in this court (the "Limited Action"). Limited alleged that Terramar breached the Operating Agreement by failing to act diligently to obtain an extension of the Seaport Village lease and a lease on the adjacent property. Limited also alleged that Terramar breached the Operating Agreement by providing first-party financing to the Company and wrongfully allocating income to Limited. The Trust was not a party to the lawsuit.

---

[13] *Id.* at 32.

[14] Dkt. 31, Ex. E at 2.

[15] *Id.* at 1.

6

Terramar moved to dismiss Limited's claims. In February 2014, this court granted the motion to dismiss in part. The parties moved forward with discovery on the surviving claims.

**D.     Terramar Exercises The Put Right.**

On December 18, 2015, Terramar exercised the Put Right by giving notice to the Trust and Limited that Terramar desired to have its member interests purchased (the "Buy-Out Notice"). As required by the Operating Agreement, the Buy-Out Notice contained Terramar's assessment of (i) the Company's fair market value using a contractually defined standard ("Company Fair Market Value") and (ii) a contractually determined purchase price for Terramar's interests (the "Terramar Purchase Price"). A key component of the Terramar Purchase Price was the amount that Terramar would receive under the distribution provisions in the Operating Agreement if all of the Company's assets were sold for an amount equal to Company Fair Market Value (the "Waterfall Distribution").

Both the Trust and Limited submitted notices disputing Terramar's assessment of the Company Fair Market Value. The notices in turn triggered a contractual procedure for establishing Company Fair Market Value. The parties followed this procedure, which resulted in a Company Fair Market Value of $57,503,287.00.

The Operating Agreement did not establish any mechanism for resolving other disputes over the calculation of the amount of the Terramar Purchase Price. Both Limited and the Trust informed Terramar that they believed that Terramar misapplied the

7

distribution provisions when calculating the Waterfall Distribution for purposes of determining the Terramar Purchase Price.

The Operating Agreement provided that once the Terramar Purchase Price has been determined, then the other members would have six months to buy out Terramar at that price. If Terramar did not receive the Terramar Purchase Price within six months, then Terramar would gain the right to cause the dissolution of the Company. The Operating Agreement further provided that once Terramar exercised the Dissolution Right, then Terramar could sell the property and assets of the Company "on such terms and conditions as [Terramar] determined in its sole and absolute discretion," except for sales to controlled affiliates of Terramar, where other contractual restrictions would apply.[16]

The Trust, Limited, and Terramar agreed that the six-month period expired on November 9, 2016. Terramar did not receive the Terramar Purchase Price within the six-month period (or at any time thereafter).

Terramar contends that it now possesses the right to dissolve the Company and to sell its property and assets. The Trust disputes Terramar's position, contending that Terramar misapplied the distribution provisions in the Operating Agreement and hence failed to calculate the Terramar Purchase Price correctly. The Trust also has taken the position that Terramar only can cause the Company to sell its assets to existing members of the Company.

---

[16] Dkt. 26., Ex. A at 32.

On November 4, 2016, Terramar filed this action against Limited and the Trust. Terramar sought a declaration that it was entitled to exercise the Dissolution Right and had correctly calculated the Waterfall Distribution. The court subsequently issued a post-trial decision in the Limited Action, which ruled in favor of Terramar on all claims.

In January 2017, Terramar agreed to purchase Limited's 25% membership interest in the Company, giving Terramar a 75% membership interest. Terramar then dismissed Limited from this action with prejudice. On February 10, 2017, Terramar filed the currently operative complaint. It seeks a declaration that Terramar has the right to dissolve the Company, "is entitled to unilaterally sell all of [the Company's] property and assets to a third party in connection with [the Company's] dissolution," and "has correctly calculated the Waterfall Distribution."[17]

## II.      LEGAL ANALYSIS

The Trust has moved to dismiss the Complaint pursuant to Rule 12(b)(2). According to the Trust, a Delaware court cannot exercise personal jurisdiction over the Trust for purposes of the claims that Terramar has asserted under the Operating Agreement.

When a defendant moves for dismissal pursuant to Rule 12(b)(2), "[t]he plaintiff has the burden to show a basis for the Court's jurisdiction over the nonresident defendant."[18] Unless the parties have conducted jurisdictional discovery and the court has

---

[17] Dkt. 19 ¶ 32.

[18] *Sprint Nextel*, 2008 WL 2737409, at *5 (collecting cases).

held an evidentiary hearing, a plaintiff "need only make a *prima facie* showing, in the allegations of the complaint, of personal jurisdiction and the record is construed in the light most favorable to the plaintiff."[19]

Determining "whether a Delaware court has jurisdiction over a nonresident defendant" requires a two-step analysis.[20] In the first step, the court must determine whether the plaintiff has identified a legally cognizable basis for asserting jurisdiction over the defendant. Typically this involves identifying and meeting the requirements of a statute, such as Delaware's long-arm statute.[21] In the second step, the court must determine whether exercising personal jurisdiction over the defendant passes muster under the Due Process Clause of the United States Constitution.[22] To avoid due process problems, "a nonresident defendant must have sufficient 'minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"[23]

## A.     The Long-Arm Statute

Terramar claims that Delaware's long-arm statute permits this court to exercise personal jurisdiction over the Trust for purposes of the claims to enforce the Operating

---

[19] *Id.*

[20] *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012).

[21] *Id.*

[22] *Id.*

[23] *Id.* (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations omitted)).

Agreement. "Under § 3104(c)(1), a court may exercise personal jurisdiction over a nonresident who, 'in person or through an agent . . . [t]ransacts any business or performs any character of work or service in the State . . . .'"[24] Section 3104 is a "single act" statute.[25] Therefore, a "single transaction is sufficient to confer jurisdiction where the claim is based on that transaction."[26] Put another way, a single business transaction in Delaware "may supply the jurisdictional basis for suit only with respect to claims which have a nexus to the designated conduct."[27]

Forming a Delaware entity both requires a filing in Delaware with the Secretary of State and necessarily has an effect within Delaware. Not surprisingly, Delaware courts have held consistently that forming a Delaware entity constitutes the transaction of business within Delaware that is sufficient to establish specific personal jurisdiction under Section 3104(c)(1).[28] Delaware courts similarly have found that making an entity-

---

[24] *Id.* (alteration in original) (quoting 10 *Del. C.* § 3104(c)(1)).

[25] *Eudaily v. Harmon*, 420 A.2d 1175, 1180 (Del. 1980).

[26] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000) (internal quotations omitted).

[27] *LaNuova D & B, S.p.A v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986).

[28] *See, e.g.*, *In re Mobilactive Media, LLC*, 2013 WL 297950, at *28 (Del. Ch. Jan. 25, 2013) (finding § 3104(c)(1) satisfied where defendant incorporated Delaware entities for the purpose of accomplishing one of the challenged acts); *Conn. Gen. Life Ins. Co. v. Pinkas*, 2011 WL 5222796, at *2 (Del. Ch. Oct. 28, 2011) (explaining that "a single act of incorporation, if done as part of a wrongful scheme, will suffice to confer personal jurisdiction under § 3104(c)(1)"); *EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 BV*, 2008 WL 4057745, at *6 (Del. Ch. Sept. 2, 2008) ("[T]he incorporation and operation of a Delaware subsidiary constitutes the transaction of business under § 3104(c)(1)."). *See generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial*

11

related filing, such as filing a certificate of cancellation, constitutes the transaction of business in Delaware that is sufficient to establish specific personal jurisdiction under Section 3104(c)(1).[29]

Because § 3104(c)(1) confers specific, not general, jurisdiction, there must be a nexus between the formation of the Delaware entity and the cause of action asserted in the lawsuit.[30] When determining whether a sufficient nexus exists, the principal factor that Delaware courts have examined is the extent of the factual relationship between the formation of the Delaware entity and the cause of action. "[I]n suits in which the incorporation of a Delaware subsidiary is an integral component of the conduct giving rise to the cause of action, the Delaware courts have consistently recognized that a nonresident defendant's incorporation of such subsidiary constitutes sufficient 'minimum

---

*Practice in the Delaware Court of Chancery* § 3.04[c][3], at 3-101 (2012) (collecting cases) [hereinafter Wolfe & Pittenger].

[29] *See Matthew*, 56 A.3d at 1027-28 ("Filing a certificate of cancellation is the transaction of business in Delaware within the meaning of § 3014(c)(1)."); *Sample v. Morgan*, 935 A.2d 1046, 1057 (Del. Ch. 2007) (Strine, V.C.) (same); *see also Lake Treasure Hldgs., Ltd. v. Foundry Hill GP LLC*, 2013 WL 6184066, at *3 (Del. Ch. Nov. 21, 2013) ("The filing of a UCC financing statement can be sufficient under § 3104(c)(1) because Delaware's long arm statute is a single-act statute.").

[30] *See LaNuova*, 513 A.2d at 768 (explaining that the "single act" provisions of Section 3104 "supply the jurisdictional basis for suit only with respect to claims which have a nexus to the designated conduct"). *Compare Lake Treasure*, 2013 WL 6184066, at *3 (finding sufficient nexus between claims and filing of UCC financing statement in Delaware) *with Solae, LLC v. Hershey Can., Inc.*, 557 F. Supp. 2d 452, 459–60 (D. Del. 2008) (finding filing of UCC financing statement insufficient under § 3104(c)(1) where plaintiff did not assert any nexus between that act and the conduct giving rise to plaintiffs claim), *and Sanitec Indus., Inc. v. Sanitec Worldwide, Ltd.*, 376 F. Supp. 2d 571, 574 (D. Del. 2005) (same).

12

contacts' with Delaware."[31] This court has held that a cause of action is sufficiently related to the entity's formation if the formation "set in motion a series of events which form the basis for the cause of action before the court."[32] Delaware courts have interpreted the relatedness requirement broadly when the underlying claims involve the internal affairs of a Delaware entity.[33] This is because "the creation of a legal entity creates a forum state public interest in the governance of that entity."[34]

---

[31] Wolfe & Pittenger, § 3.04[c][3], at 3-100. *See*, *e.g.*, *Hamilton P'rs L.P. v. Englard*, 11 A.3d 1180, 1196 (Del. Ch. 2010) (finding that specific personal jurisdiction existed over defendant to consider claims for breach of fiduciary duty by defendant arising out of a settlement where the parties agreed to create a Delaware entity to hold the intellectual property assets that formed part of the settlement); *Cairns v. Gelmon*, 1998 WL 276226, at *3 (Del. Ch. May 21, 1998) (finding that specific jurisdiction over the defendant existed to consider a claim for breach of a joint venture agreement where the defendant participated in the formation of the joint venture).

[32] *Microsoft Corp. v. Vadem, Ltd.*, 2012 WL 1564155, at *7 (Del. Ch. Apr. 27, 2012) (internal quotations omitted).

[33] *Compare In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *23 (Del. Ch. May 4, 2005) (holding that the court could exercise personal jurisdiction over a foreign corporation for a claim of aiding and abetting a breach of fiduciary duty by directors of Delaware corporations; emphasizing that Delaware's interest "in ensuring that board of directors of Delaware corporations fulfill their fiduciary duties . . . would be undermined if entities that allegedly aid and abet breaches of fiduciary duties of Delaware corporations could not be held accountable in Delaware courts") *with Mobile Diagnostic Gp. Hldgs, LLC v. Suer*, 972 A.2d 799, 808-09 (Del. Ch. 2009) (distinguishing *Hughes* and declining to exercise jurisdiction for breach of contract claim because "Delaware's strong interest in providing a forum for claims involving the internal affairs of domestic corporations is not implicated in this case").

[34] *In re USACafes, L.P. Litig.*, 600 A.2d 43, 51 (Del. Ch. 1991) (Allen, C.); *see also Sternberg v. O'Neil*, 550 A.2d 1105, 1125 (Del. 1988) ("Delaware has more than an interest in providing a sure forum for . . . litigation involving the internal affairs of its domestic corporations. Delaware has an obligation to provide such a forum.") (internal citations and footnote omitted).

The leading case addressing the relationship between the formation of a Delaware entity and a claim for breach of contract is *Papendick v. Bosch*.[35] Bosch, a German limited liability company, entered into a contract with Papendick that called for Bosch to pay a finder's fee if Bosch successfully acquired Borg-Warner Corporation. Bosch subsequently entered into a transaction to acquire Borg-Warner and formed a Delaware corporation as the acquisition vehicle. After Bosch refused to pay the finder's fee, Papendick sued for breach of contract in the Delaware Superior Court. Bosch moved to dismiss for lack of personal jurisdiction, and the Superior Court granted the motion.[36] The Superior Court found that Bosch's "sole contact with Delaware is the ownership of stock in [the subsidiary] after utilizing the incorporation laws of this state."[37] Applying the United States Supreme Court's then-recent decision in *Shaffer v. Heitner*,[38] the Superior Court concluded that this contact was insufficient to support personal jurisdiction over Bosch for purposes of a claim for breach of the finder's fee agreement.

The Delaware Supreme Court reversed. The high court explained that, unlike in *Shaffer*, Bosch's contacts with Delaware were not limited to "mere ownership of stock having its situs in Delaware."[39] Rather, Bosch created a Delaware corporation "as an

---

[35] 410 A.2d 148 (Del. 1979), *cert denied*, 446 U.S. 909 (1980).

[36] *Papendick v. Robert Bosch G/m/b/h*, 389 A.2d 1315, 1318 (Del. Super. 1978), *rev'd*, 410 A.2d 148 (Del. 1979).

[37] *Id.*

[38] 433 U.S. 186 (1977).

[39] *Papendick*, 410 A.2d at 151.

integral part of its total transaction with [Borg-Warner] to which the plaintiff's instant cause of action relates."[40] The Supreme Court held that under those circumstances, Bosch had "purposefully avail[ed] itself of the benefits and protections of the laws of the State of Delaware for financial gain in activities related to the cause of action."[41] Consequently, a Delaware court could exercise specific personal jurisdiction over Bosch for purposes of Papendick's contractual claim for his finder's fee.

Following *Papendick*, courts in Delaware have held that a sufficient nexus exists between the formation of an entity and claims to enforce the constitutive documents of that entity.[42] *Papendick* showed that specific jurisdiction to enforce a contract exists

---

[40] *Id.* at 152.

[41] *Id.*

[42] *See Shamrock Hldgs. of Cal., Inc. v. Arenson*, 421 F. Supp. 2d 800, 804 (D. Del. 2006) (finding that specific personal jurisdiction over defendants existed to consider a claim for a declaratory judgment that the plaintiffs had not breached the operating agreements governing two LLCs where the plaintiffs and the defendants were members of LLCs and had "agreed to the formation and funding of [the entities] for the purpose of implementing their mutually agreed objective of developing a home-building business"; holding that the plaintiffs' causes of action "arise from, and relate to, the incorporation and formation" of the Delaware entities); *Gelmon*, 1998 WL 276226, at *3 (finding that specific jurisdiction over defendant existed to consider a claim for breach of a joint venture agreement where the parties formed the entity to carry out their joint venture and the plaintiff contended that the defendant had failed to comply with governance provisions in the agreement); *see also Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *10 n.32 (Del. Ch. Mar. 31, 2003) (Strine, V.C.) (observing in *dicta* that exercising jurisdiction under *Papendick* for claims to enforce an entity's constitutive documents is consistent with "the [Delaware] Supreme Court's command that the long-arm statute be construed liberally"); *cf. Pinkas*, 2011 WL 5222796, at *2 ("But merely participating in the formation of a Delaware entity, without more, does not create a basis for jurisdiction in Delaware. Instead, the formation must be an integral component of the

where the formation of a Delaware entity is "part of [a] total transaction . . . to which the plaintiff's . . . cause of action relates."[43] In *Papendick*, the contract and the formation of the Delaware entity were separate parts of the total transaction, yet the formation of a Delaware entity provided a sufficient basis to exercise personal jurisdiction over the contractual counterparty for purposes of enforcing the contract. When the contract in question is the constitutive document governing the Delaware entity itself, the relationship is significantly closer. Indeed, it is as close as it can be. Moreover, a claim to enforce the entity's constitutive document necessarily implicates the special interest that a sovereign has in adjudicating cases involving the internal affairs of entities created under its laws.

Under *Papendick* and its progeny, a nexus exists between the formation of the Company and Terramar's claims to enforce the Operating Agreement that is sufficient to permit this court to exercise specific personal jurisdiction over the Trust. The Operating Agreement is the constitutive document that governs the Company. The business deal that Terramar seeks to enforce was embodied in the Operating Agreement and implemented through the creation of the Company. Forming the Company was the act that gave "legal life to [the Operating Agreement] as a legally viable contract."[44] Creating

---

total transaction to which plaintiff[']s cause of action relates.") (internal quotations omitted).

[43] *Papendick*, 410 A.2d at 152.

[44] *Conrad*, 2003 WL 1787959, at *10 n.32.

the Company was necessary both to complete the transaction and to give effect to the contract that Terramar seeks to enforce. The formation of the Company thus "set in motion a series of events which form the basis for the cause of action before the court."[45]

A second factor that courts have considered is the degree of involvement that the defendant had in the formation of the entity. Section 3104(c)(1) only permits the assertion of personal jurisdiction over a party who "in person or through an agent . . . [t]ransacts any business or performs any character of work or service in the State . . . ."[46] As a defendant's involvement in the underlying transaction and the formation of the Delaware entity becomes more attenuated, it becomes more difficult to hold that the defendant transacted business in the state. This court has declined to exercise personal jurisdiction over defendants who were not meaningfully involved in structuring the underlying transaction or negotiating the terms of the deal.[47]

At this procedural stage, the record supports a reasonable inference that the Trust, through Cohen, played a meaningful role in forming the Company and negotiating the Operating Agreement. Cohen brokered the deal. He had an existing and ongoing professional relationship with Taubman and Limited. He possessed contractual rights to

---

[45] *Microsoft*, 2012 WL 1564155, at *7 (internal quotations omitted).

[46] 10 *Del. C.* § 3104(c)(1).

[47] *See, e.g.*, *Suer*, 972 A.2d at 808 (declining to exercise jurisdiction over a defendant who had only a "limited involvement in negotiating and structuring the transaction"); *EBG Hldgs.*, 2008 WL 4057745, at *7 (declining to exercise personal jurisdiction and emphasizing that the defendant did not "participate[] in the formation [of the entity] in a meaningful fashion").

17

cash flows from Limited and Lending that resembled equity rights in the entities. As part of the Terramar Transaction, he received an equity interest in the Company. He also bargained for a unique economic benefit in the form of an exclusive right to broker future financings for Seaport Village. In related litigation in California, Terramar's lawyer testified that "[m]ost of the conversations about deal terms and the transaction structure and such were had with Mr. Cohen."[48] Taubman similarly recalled that "Cohen was the one that was negotiating the deal."[49]

In effort to defeat the foregoing analysis, the Trust argues that the formation of a Delaware entity must be "part of a wrongful scheme" before a court can exercise personal jurisdiction under *Papendick*. There are Delaware cases that speak in these terms, but they involved cases where the claim that the plaintiff sought to assert involved wrongful conduct, such as a claim for fraud or for breach of fiduciary duty.[50] The exercise of specific personal jurisdiction requires a nexus between the forum-directed conduct and the claim being asserted. Whether a sufficient nexus exists necessarily depends on the nature of the claim. If the claim turns on a wrongful conduct or scheme, then the formation of the Delaware entity must relate to the wrongful conduct or scheme before it can support the exercise of specific personal jurisdiction. But where, as in *Papendick* and this case, the underlying claim is for breach of a contract, wrongfulness is not required.

---

[48] Dkt. 31, Ex. C at 18:3-5.

[49] Dkt. 31, Ex. B. at 97:7-12.

[50] *See, e.g.*, *Pinkas*, 2011 WL 5222796, at *2; *Gelmon*, 1998 WL 276226, at *3.

The determinative question instead is the relationship between the contract and the formation of the entity, *i.e.* whether the formation of the Delaware entity was an "integral part" of the contractual relationship that the plaintiff seeks to enforce.[51] Here, it clearly was: the Company and its operating agreement are inextricably linked.

The Trust next cites more pertinent precedents in which this court has declined to exercise specific personal jurisdiction under *Papendick* for claims asserting a breach of an entity's constitutive documents. Those cases are distinguishable. In *Connecticut General Life Insurance Company v. Pinkas*,[52] the plaintiffs argued that the third-party defendants improperly attempted to substitute themselves as managers of the funds in which the plaintiffs invested. The court held that it could not exercise personal jurisdiction over the third-party defendants under *Papendick* because "the bases of the claims asserted . . . do not relate to the formation of [the entity] in any direct way; in fact, they only relate to [the entity's] formation in the most attenuated way possible – that [the entity] must have existed in order for [the third party defendants] to have damaged it in the way alleged."[53] Unlike the Trust, the third-party defendants had not signed the funds' operating agreements, were not members of the funds, and had not negotiated the terms of their governing documents.

---

[51] *Papendick*, 410 A.2d at 152.

[52] 2011 WL 5222796 (Del. Ch. Oct. 28, 2011).

[53] *Id.* at *2.

19

The Trust also cites *Kahuku Holdings, LLC v. MNA Kahuku, LLC*.[54] The plaintiff owned a 92% member interest in a Delaware limited liability company and was the entity's sole manager under an operating agreement that contained a provision mandating arbitration of all disputes in Hawaii. Notwithstanding the arbitration provision, the plaintiff sued the defendant in the Court of Chancery. The defendant moved to dismiss in favor of arbitration and alternatively contested personal jurisdiction, arguing that this court lacked jurisdiction over a passive minority member who owned an 8% non-voting interest. The court enforced the arbitration provision, and the decision primarily concerned that issue.[55] The court noted that given its holding on arbitrability, it did not need to reach the question of personal jurisdiction.[56] For the sake of completeness, however, the court observed that the plaintiff would have "a stiff grade to claim" because of the minority investor's minimal role in the formation of the entity and lack of contacts with Delaware. On the latter point, the court observed that although the minority investor participated in the formation of a Delaware LLC and negotiated the terms of the operating agreement, "it did so only as a small, minority member with no voting rights, and further specifically contracted for an arbitration provision that *both* adopted arbitral rules that set disputes over arbitrability in a Hawaiian court *and* expressly named Hawaii

[54] 2014 WL 4699618 (Del. Ch. Sept. 15, 2014).

[55] *Id.* at *3-5.

[56] *Id.* at *5.

20

as the venue for settling disputes over arbitrability."[57] The court suggested that even if the minority member's participation in the formation of a Delaware LLC satisfied the long-arm statute, it would raise due process issues to hale the minority member "into a Delaware court six time zones to the east."[58] Rather than foreclosing the exercise of specific personal jurisdiction based on a member's participation in forming a Delaware LLC and negotiating its operating agreement, *Kahuku*'s dictum recognizes its feasibility, subject to the constraints of due process.

The Trust relies most heavily on *Fisk Ventures*, *LLC v. Segal*,[59] where the entity at issue was a Delaware limited liability company named Genitrix LLC. It had three classes of member interests—A, B, and C—with each class held by multiple investors. Andrew Segal, the founder, President, and CEO of Genitrix, held a majority of the Class A interests. H. Fisk Johnson, a significant investor in Genitrix, held a majority of the Class B interests, some directly and others through Fisk Ventures, another entity that Johnson controlled.[60] By the time of the dispute, Genitrix had run out of money, and the board of managers was deadlocked.

The litigation in Delaware began when Fisk Ventures petitioned to dissolve Genitrix. Segal responded by filing third-party claims against Johnson and his appointees

---

[57] *Id.* at *6.

[58] *Id.*

[59] 2008 WL 1961156 (Del. Ch. May 7, 2008).

[60] *Id.* at *2-3.

on the board of managers. Segal contended that Johnson and his appointees breached Genitrix's operating agreement because they "refused to accede to Segal's proposals with respect to research, financing, and other matters."[61] He further alleged that Johnson's appointees breached the operating agreement when they removed him as CEO. He also asserted claims for breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and tortious interference with contract, all of which were predicated on the purported breaches of the operating agreement. Johnson and the other counterclaim-defendants moved to dismiss the claims under Rule 12(b)(6) for failure to state a claim upon which relief could be granted. Johnson also moved to dismiss the claims against him under Rule 12(b)(2) for lack of personal jurisdiction.

Segal's claims were plainly specious, and the court dismissed all of them under Rule 12(b)(6). The court observed that Genitrix's operating agreement "[i]n no way . . . obligate[s] one class to acquiesce to the wishes over the other simply because the other believes its approach is superior or in the best interests of the Company."[62] Segal's claim that he was improperly terminated as CEO was similarly meritless. The LLC agreement stated that Segal's employment agreement would control over any contrary provisions in the LLC agreement, and the board of managers complied with Segal's employment agreement when they removed him.

---

[61] *Id.* at *9.

[62] *Id.*

The court separately held that it could not exercise personal jurisdiction over Johnson. According to Segal, Johnson had "insisted that Genitrix be formed under Delaware law before he would invest in the Company."[63] In a single sentence, the court rejected the contention that any nexus existed between Segal's claims and the formation of Genitrix: "Indeed, Dr. Johnson caused Genitrix to become a Delaware LLC and demanded that its governing contracts utilize Delaware law, but Segal's claims against Johnson have nothing to do with the formation of the Company."[64] The court therefore concluded that while "Johnson does have some limited contacts with Delaware . . . Segal's claims against Johnson do not arise from and have no nexus with those limited contacts."[65] The opinion did not discuss *Papendick*. It focused instead on cases standing for the settled propositions that ownership of equity in a Delaware corporation or purchasing shares in a Delaware corporation, without more, are not sufficient to support personal jurisdiction over the owner or purchaser of the shares.[66]

In my view, *Fisk's* brisk treatment does not establish a rule of law that a claim to enforce a limited liability company's operating agreement lacks a sufficient nexus to the

---

[63] *Id.* at *3.

[64] *Id.* at *7.

[65] *Id.*

[66] *See id.* at *7 & n.20 ("Mere ownership of a Delaware company does not constitute a sufficient basis for personal jurisdiction." (citing *Turner*, 846 A.2d at 975 ("[O]wnership of a Delaware corporation is not, without more, a sufficient contact on which to base personal jurisdiction."), and *Abajian v. Kennedy*, 1992 WL 8794, at *10 (Del. Ch. Jan. 17, 1992) (Allen, C.) ("Merely purchasing stock in a Delaware corporation does not supply the requisite contacts necessary for jurisdiction in a case of this kind."")).

entity's formation to support personal jurisdiction under *Papendick*, particularly when the party against whom the claim is asserted participated in the formation of the entity and the negotiation of the operating agreement. The court's assessment of the personal jurisdiction issue appears to have been influenced by Segal's scattershot presentation of multiple arguments, which the court characterized as an effort "to throw every conceivable contact Johnson has had with Delaware at the wall of personal jurisdiction" in the hope that something would stick.[67] The court's summary approach to the jurisdictional analysis also was likely influenced by the speciousness of Segal's underlying claims. In any event, because the court found that Segal failed to state a claim upon which relief could be granted, the jurisdictional ruling was *dictum*.[68]

In this case, Terramar's claims under the Operating Agreement implicate core issues discussed by the parties when negotiating the underlying transaction that gave rise to the Company's formation. Through Cohen, the Trust consciously chose to incorporate the Company as a Delaware entity and to embody core deal terms in the Company's governing documents, including terms that implicated the internal affairs of the Company. This was a transaction of business in Delaware for purposes of Delaware's

---

[67] *Id.* at *7; *see also id.* at *7-8 (analyzing additional theories under 8 *Del. C.* § 18-109).

[68] *See Brown v. United Water Del., Inc.*, 3 A.3d 272, 276-77 (Del. 2010) (defining dictum as statements that "would have no effect on the outcome of the case"); *Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377, 398 (Del. 2010) (declaring part of the lower court's ruling to be "*obiter dictum* and without precedential effect" where that issue did not need to be decided in light of other rulings in the case).

long-arm statute, and Terramar's claims bear a sufficient nexus to this transaction of business to warrant the exercise of personal jurisdiction.

## B. Due Process

Having determined that a legal basis exists for exercising personal jurisdiction over the Trust under Section 3104(c)(1), this decision must evaluate whether doing so comports with due process. "The focus of this inquiry is whether [the defendant] engaged in sufficient minimum contacts with Delaware to require it to defend itself in the courts of this State consistent with the traditional notions of fair play and justice."[69] "Once it has been decided that a defendant purposefully established minimum contacts with the forum State, these contacts must be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice."[70] Relevant factors include "the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief . . .; [and] the interstate judicial system's interest in obtaining the most efficient resolution of controversies . . . ."[71]

---

[69] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 440 (Del. 2005) (internal quotations omitted).

[70] *Sternberg*, 550 A.2d at 1122 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

[71] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 220 (Del. 1982) (citations omitted) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

Since *Papendick*, Delaware courts have consistently held that meaningful participation in the formation of the Delaware entity constitutes sufficient minimum contacts to satisfy due process.[72] "There is a controlling distinction . . . between the ownership of [equity] acquired by purchase or grant . . . and ownership arising from the purposeful utilization of the benefits and protections of the Delaware [entity statute] in activities related to the underlying cause of action . . . ."[73]

In this case, the Trust was not merely a passive minority investor who acquired and owned equity in a Delaware entity. Through Cohen, the Trust participated in negotiating the deal that resulted in the formation of the Company and participated in negotiating the Operating Agreement itself. By doing so, the Trust "purposefully avail[ed] itself of the benefits and protections of the laws of the State of Delaware for financial gain in activities related to the cause of action."[74] "Having engaged in conduct that involved the formation of a Delaware entity, [the Trust] should have reasonably anticipated that [its] actions might result in the forum state exercising personal jurisdiction over [it] in order to adjudicate disputes arising from those actions."[75]

---

[72] *See, e.g. Mobilactive Media*, 2013 WL 297950, at *29; *Hughes*, 2005 WL 1089021, at *23; *see also AeroGlobal*, 871 A.2d at 440 ("We find the teachings from this Court's opinion in *Papendick* instructive.").

[73] *Papendick*, 410 A.2d at 152.

[74] *Id.*

[75] *Hamilton P'rs*, 11 A.3d at 1198-99 (internal quotations and alterations omitted).

The other relevant factors also countenance in favor of jurisdiction. Delaware has a significant interest in adjudicating disputes implicating the internal affairs of Delaware entities.[76] Moreover, Terramar's claims in this case relate to its right under the Operating Agreement to dissolve the Company. Dissolution both implicates the internal affairs of a Delaware entity and is an inherently Delaware-centric act which requires the filing of a certificate of cancellation with the Delaware Secretary of State.[77] Having granted Terramar the Dissolution Right, "it is difficult to conceive how it would shock the conscience to require the [Trust] to defend a lawsuit in Delaware."[78]

Similarly, Terramar's "interest in obtaining convenient and effective relief" and judicial economy both weigh in favor of exercising jurisdiction.[79] A court in California, the most obvious alternative forum, has already held that any claim to dissolve the Company must be brought in Delaware. Absent jurisdiction over the Trust, Terramar might have sought to determine its rights under the Operating Agreement through an *in*

---

[76] *See Morgan*, 935 A.2d at 1064 ("Delaware, as a chartering state, has an important interest in regulating the internal affairs of its corporations."); *USACafes*, 600 A.2d at 51 ("[W]hen a person has purposefully acted to create a relationship, even of some minimal kind, with the forum state, then 'the forum state's interest in adjudicating the dispute' should be given weight . . . .") (quoting *World-Wide Volkswagen*, 444 U.S. at 292).

[77] *See* 6 *Del. C.* § 18-203 ("A certificate of cancellation shall be filed in the office of the Secretary of State to accomplish the cancellation of a certificate of formation . . . ."); *In re Carlisle Etcetera LLC*, 114 A.3d 592, 601-06 (Del. Ch. 2015) (explaining the sovereign's particular interest in dissolving entities that it has formed).

[78] *Morgan*, 935 A.2d at 1064.

[79] *Istituto*, 449 A.2d at 220 (quoting *World Wide Volkswagen*, 444 U.S. at 292).

*rem* dissolution proceeding,[80] but this too would have resulted in litigation in this court. Additionally, this court is familiar with the parties and the underlying facts through its adjudication of the Limited Action. Litigating Terramar's claims in this court therefore will provide the parties a just and speedy resolution.

The only due process consideration that gives me pause is the passage of time between the Trust's Delaware contacts and this litigation. Federal courts are "deeply split about the issue of the timing of minimum contacts in specific jurisdiction cases."[81] Delaware law provides little guidance on the subject. The Delaware Supreme Court has

---

[80] *See In Re Rehabilitation of Nat'l Heritage Life Ins. Co.*, 656 A.2d 252, 260 (Del. Ch. 1994) (Allen, C.) ("A dissolution proceeding is an *in rem* action; those who have claims against the corporation can have those claimed corporate obligations affected in the domestic rehabilitation or dissolution, upon notice and opportunity to be heard, whether or not they are subject to *in personam* jurisdiction in the state where the dissolution or rehabilitation is taking place.").

[81] Todd David Peterson, *The Timing of Minimum Contacts*, 79 Geo. Wash. L. Rev. 101, 132 (2010). *Compare Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003) ("[M]inimum contacts must exist either at the time the cause of action arose, the time the suit is filed, or within a reasonable period of time immediately prior to the filing of the lawsuit.") *with Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) ("The requisite contacts, however, may be supplied by the terms of the agreement, the place and character of prior negotiations, contemplated future consequences, or the course of dealings between the parties."), *Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987) ("[T]he determination of amenability to suit takes place at the time of the relevant contacts . . . [T]he fair warning given [a defendant] by his contacts with [a state] does not expire simply because of his lack of later contacts with the state."), *and McMullen v. European Adoption Consultants, Inc.*, 109 F. Supp. 2d 417, 420 (W.D. Pa. 2000) ("The absence of a bright-line rule establishing a temporal framework for the minimum contacts analysis strongly reinforces the fact-specific, case-by-case nature of all jurisdictional analysis."). The United States Supreme Court "has never directly addressed the issue of the timing of minimum contacts in any of its personal jurisdiction decisions." Peterson, *supra*, at 104.

emphasized, however, that a defendant "who has purposefully directed its activities at a forum . . . must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[82] While another set of facts might give rise to a compelling case based on the passage of time, this case does not. The Trust contemplated a long-term relationship with the Company when the parties formed it. That relationship included the possibility that Terramar would exercise its Put Right and Dissolution Right years later. The Trust cannot complain now that it could not have anticipated being haled into a Delaware court. On the facts of this case, exercising personal jurisdiction over the Trust comports with due process.

## III.    CONCLUSION

Under Delaware's long-arm statute, this court can exercise specific personal jurisdiction over the Trust for purposes of adjudicating Terramar's claims under the Operating Agreement. The exercise of specific personal jurisdiction comports with due process. The Trust's motion to dismiss is denied.

---

[82] *Sternberg*, 550 A.2d at 1122 (quoting *Burger King*, 471 U.S. at 477).

29